PATTERSON OIL TERMINALS, Inc. v. THE PORT COVINGTON.

THE GIRARD POINT.

No. 149 of 1949.

United States District Court
E. D. Pennsylvania.

Sept. 29, 1952.

Benjamin F. Stahl, Jr., and Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for libellant.

Rawle & Henderson, Philadelphia, Pa., for respondents Curtis Bay Towing Co. and Tugs Girard Point and Port Covington.

Krusen, Evans & Shaw, Philadelphia, Pa., for respondent Black Diamond S.S. Corp.

KIRKPATRICK, Chief Judge. `

This is an action to recover damages resulting from a collision between the S.S. Creighton Victory and a dolphin belonging to the libellant, located 175 feet upriver from the libellant's loading dock on the Delaware River at Billingsport, New Jersey. The accident occurred as the vessel, assisted by two tugs, was maneuvering under her own power into the berth at the end of the dock. The time was 12:20 P.M. on a clear but windy day in February and there were no other vessels anywhere near the place.

■ "When a moving vessel strikes a stationary object, such as a wharf, an inference of negligence arises and the burden is then upon the owners of the vessel to rebut the inference of negligence." General Petroleum Corp. of California v. City of Los Angeles [Hokonesan Maru], Cal. App., 109 P.2d 754, 756.

The common sense behind the rule makes the burden a heavy one. Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient for the respondent to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testimony of the witnesses, what was done was too little or too late or, if not, then the vessel was at fault for being in a position in which an unavoidable collision would occur.

■ The only escape from the logic of the rule and the only way in which the respondent can meet the burden is by proof of the intervention of some occurrence which could not have been foreseen or guarded against by the ordinary exertion of human skill and prudence—not necessarily an act of God, but at least an unforeseeable and uncontrollable event.

■ In the present case the accident occurred in broad daylight in a part of the river entirely free of all traffic which might have interfered with the maneuver or produced an unforeseeable emergency. The respondents rely upon testimony to the effect that when the vessel was about 150 feet out from the pier and not yet quite abreast of it, lying almost parallel with it, a sudden gust of wind sent her into a sheer which the pilot and crew could not possibly break before she struck the dolphin.

The Court is not called upon to appraise the seamanship involved in the steps taken

to break the sheer and decide whether they were correct and timely, as the respondents argue. Unless the conditions when the trip began were such that the gust could not have been foreseen by the exercise of the kind of judgment which good seamanship requires, the burden of disproving negligence has not been met.

The facts are these:

When the vessel hove anchor, about 20 minutes before the accident, in order to go to the berth at the oil terminal, the wind was force six on the Beaufort scale which is 20 to 24 miles per hour and which the captain translated as 15 to 20 knots. As the vessel moved down the river there were gusts up to 25 knots. Obviously, the wind was increasing in strength because after the accident there were "continuing heavy gusts of wind * * * up to 40 knots."

The captain of the vessel estimated the force of the gust which blew the vessel over toward the dock at 40 to 45 knots. The docking pilot in charge of the maneuvering estimated it at between 30 and 45 miles. The captain, asked whether there had been any other gusts of wind prior to this of that strength, said, "Didn't seem to be none that had affected the maneuvering of the vessel." Naturally, the witnesses, being charged with negligence, would not be likely to underestimate the force of the gust. However, it unquestionably caused the bow of the vessel to swing toward the dock, and I place it at 40 miles per hour.

Taking into consideration the conditions during the whole maneuvering and when the vessel left anchorage, it cannot be said that such a gust of wind, although sudden and unexpected, could not reasonably have been foreseen and provided against. The captain testified, "If · * * * gusts up to that force had been blowing all the time why I would have recommended three tugs before we approached the dock." Only two were used. There may be occasions when to take a calculated risk is good seamanship, but not in this case.

I am of the opinion that the respondents have not met the burden of disproving negligence which the law casts upon them.

As to the responsibility of the respondents I think it must be put upon both Black Diamond Steamship Corp. and Curtis Bay Towing Co. The presumption of negligence arising from a vessel's collision with a stationary object operates against all parties participating in the management of the vessel at all times when negligent management was a factor in causing the collision. During the maneuvering of the vessel in the effort to break the sheer, the captain was present on the bridge and if what the pilot did appeared to be insufficient or wrong he could have corrected or countermanded the pilot's orders. Before the vessel left her anchorage either party could have insisted upon an additional tug. The pilotage clause by which the docking pilot became the servant of the vessel and her owners does not affect the tort liability of the parties to the libellant, whatever its effect may be as between the two parties to the contract. See Publicker Industries, Inc. v. Tugboat Neptune Co., 3 Cir., 171 F.2d 48.

The dolphin was constructed of sheet steel piling with interlocking edges driven in a circle. It was filled with river bottom fill and capped with a concrete cap 12 inches thick. There was no hatch in the cap to permit inspection of the fill. The fill would normally settle as much as two feet during the first year and as much as six inches a year thereafter. The fact that the cap had no hatch in it made it impossible to inspect the level of the fill and to add more as it was needed.

The dolphin was so situated that it was inevitable that tugs and barges as well as other craft would bump and push against it, and they frequently did. As the fill settled in the dolphin, it lost a great deal of its strength, so that the normal life of a dolphin constructed and maintained as this one was and used as this one was is about 25 years. This dolphin at the time of the accident was 12 or 13 years old. After the striking by the Creighton Victory it could have been repaired in such a manner that it would have a life of 12 or 13 years from the time of the accident for $5,000. These repairs would have given the libellant a

dolphin which would last as long as the remaining life of the dolphin if it had not been damaged. It can ask for no more, and damages in the amount of $5,000 are awarded.