HOLCOMB

v.

THE ADAM E. CORNELIUS et al.

No. 11027.

United States Court of Appeals
Seventh Circuit.

May 13, 1954.

**720**

James P. Heffernan, Richards & Coffey, Buffalo, N. Y., Charles B. Quarles, Lines, Spooner & Quarles, Milwaukee, Wis., for appellant.

Harney B. Stover, Stover & Stover, Milwaukee, Wis., John D. Kehoe, Kehoe & Flatley, Green Bay, Wis., for appellee.

Before MAJOR, Chief Judge, and SWAIM and SCHNACKENBERG, Circuit Judges.

MAJOR, Chief Judge.

This is an admiralty action for the recovery of damages sustained by libellant as owner of the Dredge Oshkosh and her equipment, occasioned by the alleged negligence of the Steamer Adam E. Cornelius, owned by American Steamship Company, respondent. The case was tried before the court without a jury, at the conclusion of which findings of fact and conclusions of law were filed, upon which an interlocutory decree was entered, adjudging respondent solely liable for the damage resulting from the collision between the Cornelius and the Oshkosh and her equipment. From this adverse decree respondent appeals.

The decree is predicated upon the finding and conclusion as charged by libellant that the Cornelius was negligent in the manner in which she attempted to gain entrance to a boat slip adjacent to which was moored the Oshkosh, with which she collided, causing damage to the latter. Respondent contends that the damage was caused solely by the fault and negligence of those in charge of the Oshkosh in that she was improperly moored, partially within the entranceway to the slip so that the Dredge and her equipment constituted an obstruction to the navigation of the Cornelius. It is asserted by respondent that this alleged improper mooring on the part of the Dredge was in violation of a contract between libellant and C. R. Meyer & Son, the principal contractor, which in substance required libellant to remove its equipment so that coal boats might be free to enter and exit from the boat slip without any waiting on their part. It is also asserted that libellant violated an act of Congress of March 3, 1899, Title 33 U.S.C.A. § 401 et seq., which makes it unlawful to anchor vessels or other craft in navigable channels in such a manner as "to prevent or obstruct the passage of other vessels or craft". 33 U.S.C.A. § 409.

All the points urged by respondent for reversal rest upon the premise that the Dredge was improperly moored at the time of the collision, in violation both of libellant's contractual and statutory obligations. On this factual issue, the court found adversely to respondent's contention. In doing so it stated: "That the fixed position of the Dredge and her pontoons was outside the channel theretofore used by the Cornelius and other vessels in entering the slip; that the location of the Dredge and her equipment was not the proximate cause of the collision and damage; that the proximate cause of the collision and damage was the failure of the Master and crew of the Steamer Cornelius to avoid striking the equipment of the Dredge Oshkosh in turning into the boat slip." Predicated upon this finding, the court concluded that the location of the Oshkosh at and prior to the time of the collision was not improper or in violation of the statute.

Respondent argues that the finding as to the location of the Oshkosh at the time of the collision is contrary to the physical facts and is, therefore, clearly erroneous. This argument is made notwithstanding the fact that there was testimony, if believed, which supports the crucial finding. While a plausible argument is made that the Dredge was moored in an improper location, it must be remembered that the trial court which heard the testimony of many witnesses was in a better position to judge of their credibility and the weight to be attached to their testimony than is a reviewing court.

No good purpose could be served in reviewing the testimony in detail and certainly we are not called upon to judge ei-

ther of the credibility of the witnesses or the weight to be attached to their testimony. We have examined the testimony and are far from convinced that the finding of the trial court should be rejected on the basis of physical impossibility. Such being the situation, we shall only briefly refer to the facts.

The Cornelius is a bulk freighter measuring 605 x 60 feet, engaged in navigation and commerce on the Great Lakes. Her Master and Captain at the time of the collision in question had been taking the same Steamer into the slip of the Wisconsin Public Service Corporation at Green Bay, Wisconsin, on the average of twenty-five times per year since 1949. The Oshkosh is an oblong scow measuring 90 x 30 feet, without power of propulsion, with dredging machinery installed above deck. The Fox River flows from south to north and empties into Green Bay. Approximately 1000 feet south of the mouth of the river and on the west side thereof is the slip of the Wisconsin Public Service Corporation, customarily used by vessels discharging coal for use of said corporation in its power plant. The slip is 120 feet in width, with the north 80 feet fully dredged to a depth of about 25 feet. The Fox River opposite the entrance of said slip is a wide stream with a dredged channel near the center of said river approximately 300 feet in width.

On the 28th day of August, 1951, the Cornelius arrived at the mouth of the Fox River with a cargo of coal to be unloaded on the dock of the Wisconsin Public Service Corporation. She was met by the Tug Reiss, which towed her up the Fox River to make a right hand turn into the slip of the Wisconsin Public Service Corporation. The movement, however, was under the control and direction of the Master of the Cornelius.

Prior to and on August 28, 1951, the Oshkosh was employed by libellant in dredging the Fox River outside the entrance of the Service Corporation slip and to the north thereof. After completion of her engagement on August 28, she was moored at a location much in dispute, as heretofore noted. As the Cornelius approached the slip entrance, it was daylight, the weather was clear and the Oshkosh was in plain sight of those in charge of the Cornelius. There was neither wind nor current which appreciably affected the maneuver. As to what happened from then on, we can do no better than quote the finding of the District Court which we hold is substantially supported. The court found: "That the Tug and Steamer commenced the right hand turn before they had arrived opposite the boat entrance upstream; that the Steamer turned somewhat to the right, but proceeding slow, came to a stop with her stem on the bottom in shallow water to the south of the boat slip entrance on the west side of the river; that thereupon the Steamer backed and filled and came to a stop with her stem on the bottom in the south side of the entrance to the boat slip and her starboard side against the bottom in shallow water to the east of the north wharf of the boat slip extended; that said Steamer was then safely located in a position where she was not endangering the Dredge or herself; that her starboard side, forward, was clear of the Dredge Oshkosh; that those in charge of the Steamer thereupon requested a group on the deck of the Dredge to move the Dredge and her pontoons out of the way; that those upon the Dredge answered and informed the Master of the Steamer that the Dredge had no steam, no motive power and no Tug available and could not move; that the Master of the Steamer then estimated that he could enter the slip and avoid striking the Dredge by eight inches to one foot; thereupon the Master of the Steamer directed the Tug Reiss to pull into the slip and worked the engines of the Steamer to enter the slip; that in swinging and entering the slip the Steamer came in contact with the pontoons afloat on the starboard side of the Dredge, smashing the pontoons and damaging the Dredge, rubbing the distance of thirty-five to fifty feet along the Steamer."

■ There is testimony that the Dredge at the time of the collision was

located in an area which had been newly and completely dredged during the previous ten days, which was to the north of and adjacent to the slip ordinarily used for navigation. This is in accordance with the finding made by the court and, such being the case, we agree with the conclusion that the Dredge at that time was not in violation either of its contractual or statutory obligations. And as heretofore stated, every contention advanced by respondent is bottomed upon the contention that the Oshkosh was moored in an improper position. Accepting the finding of the District Court in this respect, which we do, would appear to eliminate the necessity for further discussion.

We might add, however, *arguendo*, that we think the decree should be affirmed even though the Dredge was improperly located, as urged by respondent. The District Court concluded from the facts, "The collision could have been averted by the exercise of reasonable diligence on the part of those in charge of the passing Steamer."

 In Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603, 605, the court cited cases in support of the proposition that a moving vessel which collides with one that is stationary has the duty "upon her to exonerate herself from blame by showing that it was not within her power to have prevented the collision by taking reasonable and practicable precautions", and further stated, "But, even if it were held that the scows were improperly moored, such fact alone would not bar a recovery, if the collision could have been averted by the exercise of reasonable diligence on the part of those in charge of the Orion."

This rule has also been embraced in The Allemania, 2 Cir., 231 F. 942, 943, and The Morristown, 2 Cir., 9 F.2d 391, 392. In the latter case, the court in holding a moving vessel liable for negligence stated, 9 F.2d at page 392: "The Morristown's master saw plainly what turned out to be a situation of danger; he thought there was no danger, so he went ahead. This is negligence."

In the present situation, there is no room to doubt but that the Master of the Cornelius was fully cognizant of the situation with which he was confronted. As already noted, it was daylight, the weather was clear, the water was still and the Dredge was in plain view. All this appears to be admitted; in any event, it is without dispute. We think there is no point in detailing the testimony of those in charge of the Cornelius, including the Master, because it can be summarized in one sentence, that is, that the Master was fully aware of the precarious nature of the operation but decided to take the chance. His misjudgment of the situation was the direct proximate cause of the collision and the resultant damages. See Frost v. Saluski, 7 Cir., 199 F.2d 460, 462.

The decree is

Affirmed.