The **PENNSYLVANIA RAILROAD COMPANY**, Libellant,

v.

**THE S.S. BEATRICE**, her engines, etc., **A. H. Bull Steamship Co., Inc.**, **THE Tug LESTER J. GILLEN**, her engines, etc. and **Henry Gillen's Sons Lighterage, Inc.**, Respondents (**Dalzell Towing Co., Inc.**, Respondent-Impleaded).

United States District Court
S. D. New York.
March 25, 1958.

138

Burlingham, Hupper & Kennedy, New York City, for libellant. Richard W. Palmer, New York City, of counsel.

Satterlee, Browne & Cherbonnier, New York City, for respondents The Beatrice and A. H. Bull S.S. Co. A. V. Cherbonnier, Edward R. Downing, New York City, of counsel.

Foley & Martin, New York City, for respondents The Lester J. Gillen and Henry Gillen's Sons Lighterage, Inc. John H. Hanrahan, Jr., New York City, of counsel.

Hagen & Eidenbach, New York City, for respondent impleaded. Henry C. Eidenbach, John F. Quarto, New York City, of counsel.

LEVET, District Judge.

This is a suit brought by the Pennsylvania Railroad Company as libellant (hereinafter called "Pennsylvania" or "libellant") against a steamer, the S.S. Beatrice (hereinafter called "the Beatrice"), and its owner, A. H. Bull Steamship Co., Inc. (hereinafter called "Bull"), and against the Tug Lester J. Gillen (hereinafter called "the Gillen"), and its owner, Henry Gillen's Sons Lighterage, Inc. (hereinafter called "Gillen's Sons"), to recover damages sustained by libellant's Barge No. 416 (hereinafter called "Barge No. 416" or "416") and her cargo when the Gillen allegedly collided with, squeezed and sank the said barge. The libel seeks recoveries both in personam and in rem against Bull and Gillen

interests. It alleges that the negligent navigation of the Gillen and the Beatrice caused the sinking of libellant's barge.

Gillen's Sons petitioned to implead the Dalzell Towing Co., Inc. (hereinafter called "Dalzell"), which had not been originally joined, alleging fault on the part of Dalzell and the Tug Dalzellaird (hereinafter called "the Dalzellaird"), the Beatrice and libellant's Barge No. 416.

This constitutes an amended opinion, amended findings of fact and conclusions of law and supersedes the original opinion, findings of fact and conclusions of law heretofore made and filed herein.

Since the filing of the original opinion, etc., the impleaded-respondent, Dalzell, moved to amend the pleadings to assert a cross-claim by it against Bull by reason of a Pilotage Indemnity Agreement. This motion was granted. Request was also made for a further review of certain findings of fact and conclusions of law previously made by the court. The court thereupon requested all parties to file proposed findings of fact and conclusions of law, all of which were submitted on or about January 2, 1958.[1]

Among other allegations contained in Dalzell's answer to the petition of Gillen's Sons, and in its cross-claim asserted against Bull, Dalzell in effect stated:

1. That Dalzell furnished the Dalzellaird and the Gillen to assist the Beatrice in shifting from one berth to another.

2. That those in charge of the Gillen were incompetent and inattentive and failed to obey the orders of the docking pilot aboard the Beatrice.

3. That by reason of a pilotage agreement, Dalzell is entitled to indemnity from Bull as to any damages paid by Dalzell to the libellant.

Bull, by its answer to the cross-claim of Dalzell, admitted a contract of towage but denied liability to Dalzell.

After hearing the testimony of the parties, examining the exhibits, the pleadings as amended, briefs and proposed findings of fact and conclusions of law submitted by counsel, this court makes the following amended findings of fact and conclusions of law:

### Findings of Fact

1. Pennsylvania, the libellant, on December 15, 1953, and at the time of the institution of this suit, was the owner of a covered barge known as P.R.R. 416.

2. On December 15, 1953, and at the time of the institution of this suit, the Beatrice was within the Southern District of New York and within the jurisdiction of this court, and the said Beatrice was then, and now is, owned by the respondent, Bull.

3. On December 15, 1953, and at the time of the institution of this suit, the Gillen was within the Southern District of New York and within the jurisdiction of this court, and the said Gillen was then, and now is, owned by the respondent, Gillen's Sons.

4. On December 15, 1953, and at the time of the institution of this suit, the Dalzellaird was within the Southern District of New York and within the jurisdiction of this court, and the said Dalzellaird was then, and now is, owned by the impleaded-respondent, Dalzell.

5. On December 15, 1953, at the time of the collision hereinafter referred to between the Gillen and Barge 416, the Beatrice was in the possession of Bull, the Gillen, although supplied by Dalzell, was in the possession of Gillen's Sons, and the Dalzellaird was in the possession of Dalzell.

6. On December 15, 1953, at about 12:05 P.M., the 416 arrived at and was moored by its bargee, one Omundsen, in a slip located between 22nd and 23rd Streets, Brooklyn, New York, at a berth designated by a harbormaster employed by the respondent Bull, or an affiliated corporation.

7. Carfloat No. 591, owned by the Pennsylvania Railroad Company, was

---

1. Many of these proposed findings were identical with those which the court had made in the original opinion.

moored adjacent to the northerly side of the said slip and near the entrance of the slip. Outboard of it and projecting broadside into the slip the Pennsylvania Railroad Company Barge No. 438 was moored. Barge 416, also moored outside of Carfloat 591 and broadside thereto, was nearest the entrance of the slip. Further in on the same north side of the slip was a New York Central barge, Cleveland. Moored to the Cleveland with its port side outboard was Barge No. 460.

8. On the morning of December 15, 1953, Barge 416 was in a seaworthy condition, with no more than about two inches of water in the stern only, constituting a normal amount of water collected from time to time. Barge 416 had been in the yard of the Jersey City Drydock Company for an annual overhaul from November 22 through December 8, 1953.

9. On the morning of December 15, 1953, said Barge 416, with a cargo of 1,800 sacks of grain weighing approximately 90 tons, evenly stored, had proceeded from Greenville, New Jersey, to the Bull Line pier, Brooklyn, New York, in tow of the Tug Wilmington.

10. On December 15, 1953, commencing at about 12:08 P.M., the Beatrice was being shifted from berth No. 4, 20th Street, Brooklyn, New York, to berth No. 1 in a slip located between 22nd and 23rd Streets, Brooklyn, New York. The tugs Dalzellaird and Gillen were dispatched to assist in the maneuver.

11. The Beatrice is 459 feet long and 63.2 feet wide. The Dalzellaird is 93 feet long with a 25-foot beam; the Gillen is 84.8 feet long and has a beam of 24 feet. The Carfloat No. 591, which is 250 feet long and 34 feet wide, and Barge 416, which is 100 feet long and has a beam of 31 feet, with a depth of 7 feet 10 inches and a 400 ton capacity, occupied 65 feet of the width of the slip. This slip is approximately 225 feet in width.

The widest portion of the flotilla if all vessels (i.e., the Beatrice, Dalzellaird and Gillen) were massed abeam would measure approximately 112.2 feet.

12. The Beatrice was being directed by Captain Ludwig Mattisen, docking pilot and licensed tugmaster of Dalzell, who was on board the Beatrice under a contract entered into between Bull and Dalzell, which provided in part as follows:

"Pilotage

"When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom."

During the execution of the maneuver, Captain E. B. Hudgins, master of the Beatrice was on the bridge of his vessel in a position to observe the operation.[2] He testified that he was there "To see that my vessel was taken care of."

13. On the morning of December 15, 1953, the weather was clear, visibility good, but with a considerable wind. There are practically no tidal conditions in the slip. At 10:00 o'clock that morning small craft storm warnings had been announced. The reports prophesied winds "gusty southwest to west winds 25/35 m.p.h." According to the Beauford Scale, these winds were "strong"

---

2. Questioned concerning the accident, Captain Hudgins replied:
"Q. Were you in a position on the bridge where that was quite observable to you? A. Yes.

"Q. Was there anything to obstruct your view? A. No."

and were to become of "gale" force (39–46, 47–54 m.p.h.) in the afternoon.

Captain Mattisen testified that that day there was in fact a fresh west-southwest wind blowing at about 15 to 20 miles per hour. He contended that the wind did not adversely affect his docking maneuver. On the other hand, Captain Valentine A. Smith, former master of the Gillen, testified in substance that with the wind factor involved, according to his way of thinking, it was going to be a touchy maneuver to begin with. In my opinion, the wind had a tendency to bear down upon the starboard quarter of the Beatrice and set the vessel down to port, a factor which should have been considered by Mattisen in directing the maneuver. Neither Mattisen nor the master of the Beatrice had checked the weather reports before commencing the shifting of the Beatrice.

14. When the Beatrice, bow foremost, had rounded the turn into the slip into which she was being transferred, the Dalzellaird took a position on the starboard bow of the Beatrice, and the Gillen was made fast to the port bow of the steamer, connected by a line. Mattisen had a left rudder on the Beatrice as the flotilla came into the slip.

15. At the time the master of the Gillen received the order from Mattisen to let go or cast off from the Beatrice, the Gillen was abreast of the two barges outboard of the Carfloat No. 591, that is, Barges 438 and 416, and not more than 15 to 20 feet therefrom. Initially, the Gillen started to go ahead, to pass around the bow of the Beatrice, then reversing its engines it went astern, in the course of which it became wedged between the Beatrice and the 416.

16. Thus, while Barge 416 was properly moored in the slip aforementioned, sometime between 12:20 P.M. and 12:35 P.M. the port side of the Gillen so came into contact with the outboard side (the port side) of the 416.

17. At the time of the contact of the Gillen with Barge 416, moored as aforesaid, the Gillen was part of a flotilla consisting of the Gillen and the Dalzellaird, which were in the process of docking the Beatrice (in part under its own power) in the said slip at an inner berth (No. 1 berth) on the same side of the slip on which the 416 was moored. Immediately before the impact the Dalzellaird had cast off from the Beatrice.

18. The damage to Barge 416 was principally at the port bow, but the impact resulted in a large spring at other points due to the fact that some six or more planks at the port bow corner started off and the corner rake timber was damaged. Other damage was also suffered.

19. Dalzell through its employee, the pilot or tug captain on board the Beatrice, was negligent in the operation and maneuvering of the flotilla in the following respects:

(a) He failed to take into consideration the effect of the wind on the Beatrice.

(b) Prior to the maneuver, he had not consulted the available weather reports.

(c) He did not allow enough space for the flotilla to turn into the slip so as to pass the 416 at a safe and proper distance.

(d) He made no inquiry as to the rudder and engine speed adjustments of the Gillen.

(e) Several "astern orders" in the Beatrice's bell book at about the time of the collision indicated astern movements, which had a tendency to swing the stern of the flotilla into the 416.

(f) He failed to appreciate the imminent danger of the position of the Gillen between the Beatrice and the 416 before the Gillen was ordered to cast off.

(g) He failed to exercise reasonable care and good judgment in waiting as long as he did in ordering the Gillen to clear the Beatrice.

20. The Gillen and Gillen's Sons were negligent in the following respects:

(a) At all times involved herein, the Gillen's rudder and engine speed was not

adjusted to operate as rapidly as required for the maneuvering then being performed.

(b) The master of the Gillen knowingly failed to notify Mattisen that the Gillen's rudder and engine speed had not been properly adjusted before the time when orders were received from the tug captain on the Beatrice requiring maneuvering dependent upon such proper adjustments.

(c) The Gillen was negligently maneuvered at the time of the cast off from the Beatrice.

21. The Beatrice and Bull were negligent in the operation and maneuvering of the flotilla in the following respects:

(a) By the negligent acts or failure to act of Captain Mattisen while directing the flotilla from the Beatrice.

(b) By Captain Hudgins' negligent failure to act despite the imminent danger of collision arising out of the Gillen's position between the Beatrice and the 416.

(c) In not checking the weather reports.

(d) By delay in the execution of the tug captain's order to cast off from the Gillen.

22. The respondents failed to prove that the absence of Omundsen, bargee on the 416, or any other act or failure to act on the part of the libellant, was an intervening act of negligence. The bargeman left the barge at about 12:05 P.M. to present his cargo papers to the dock office and to have lunch. When he returned at about 12:35 P.M. there was only one foot of free board. At the time of the contact, libellant's floatman, Communale, employed on Carfloat No. 591, was eating his lunch on the adjoining Barge No. 438. After seeing the Gillen strike the 416, without delay he went aboard Barge 416, opened the hatch and heard the water pouring in. (The 416 had two pumps with a rated capacity of 5 to 8 gallons per minute.) Communale immediately went ashore, probably about 12:40 to 12:55 P.M., and telephoned a report of the damage to libellant's boat-master, who, between 12:55 P.M. and 1:05 P.M., promptly dispatched the Tug Wilmington to aid Barge 416. When the Wilmington arrived at approximately 1:25 P.M. the decks of the 416 were awash. The damages to the 416 were such that in the opinion of this court the sinking, as a result of the contact, was unavoidable. Any pumping available under the conditions would not have kept Barge 416 afloat. Both the barge captain, Omundsen, and Murphy, master of the Wilmington, testified that even with the tug suction pump on the Wilmington, a pumping operation would have been useless because the water was already over the decks of the 416. At 2:00 P.M. the 416 settled all the way.

23. Consequently, the aforesaid collision and damage to Barge 416 were not due to any fault, neglect or want of care on the part of the libellant or Barge 416 or of any person for whose acts libellant was responsible.

24. Each of the respondents has failed to sustain the burden of proving that it was free from any fault contributing to the collision and consequent damage to Barge 416. On the contrary, the evidence establishes that:

(a) Prior to the maneuver neither the master of the Beatrice nor Mattisen checked the available weather reports. As a result, upon the maneuver, they failed to take into account "gusty southwest to west winds at 25 to 35 miles per hour." This wind had its impact on the starboard quarter of the lightly-laden Beatrice.

(b) The flotilla was at an angle when it attempted to pass the 416. There were no more than 15 to 20 feet between the port side of the Gillen and the 416, whereas there was adequate room on the starboard side of the flotilla. Insufficient allowance for the wind was made, and the engines of the Beatrice, according to the bell book at this juncture in the maneuver, were directed astern when passing the barge. The order to the Gillen to cast off was unduly delayed and the responses by the deck hands of the Beatrice were not prompt.

(c) The rudder turns and engine of the Gillen were not adjusted to a speed sufficient for that required for harbor maneuvers. This, the Gillen's master admitted, he had never called to the pilot's attention. The master of the Gillen saw the danger which made inevitable its impact upon the 416 by pressure from the Beatrice, but he did nothing. Such negligence is sufficient to create independent liability for the Gillen's own wrongdoing.

I have, therefore, concluded that the collision and the resulting damage to Barge 416 was due to the fault and negligence of the respondent Bull and the Beatrice and those in charge of her; the respondent Gillen's Sons and the Gillen and those in charge of her; and Dalzell by reason of the acts or failure to act on the part of Captain Mattisen, its employee.

### Discussion

The libellant, Pennsylvania, seeks to fix liability upon the Gillen and the Beatrice each in rem and against Gillen's Sons and Bull as the respective owners in personam. Although libellant seeks no relief against Dalzell as an impleaded party, Dalzell also stands as though charged with fault by Pennsylvania upon the original libel. See Benedict on Admiralty, Vol. 2, Sixth Ed., pp. 538–539.

The libellant contends that when Mattisen went aboard the Beatrice to act as pilot he became a servant of Bull under the pilotage clause; that Mattisen's negligence is attributable to the owner of the Beatrice; that the libellant is entitled to a decree against the respondents —that is, the Beatrice and Bull and the Gillen and Gillen's Sons—on an equal basis.

Bull contends that the libellant is entitled to a decree solely against the Gillen in rem, and its owner, Gillen's Sons, in personam. Therefore, Bull claims that it is entitled to a decree dismissing the libel

of Pennsylvania; that Dalzell is entitled to a decree dismissing the claim of Gillen's Sons against Dalzell, and, consequently, that the cross-claim for indemnity by Dalzell against Bull should be dismissed. Bull makes no claim that the so-called "pilotage clause," referred to in Finding No. 12, is, under the circumstances of this case, void as against public policy.[3]

Respondent Gillen's Sons, which as before stated, impleaded Dalzell, now asks that the decree provide that the libellant's damages be borne one-third by the Gillen and its owner; one-third by the Beatrice and its owner; and one-third by Dalzell.

Dalzell maintains that this suit should be determined as follows:

That the libellant is entitled to a decree against the Gillen in rem and against Gillen's Sons in personam; against the Beatrice in rem and against Bull in personam; that the claim of Gillen's Sons against Dalzell be dismissed; that in effect Dalzell is entitled to indemnity from Bull as to any damages paid by Dalzell to the libellant; and finally, Dalzell asks apportionment of one-half of the damages against the Gillen and its owner and one-half against the Beatrice and its owner.

Thus, the libellant and Dalzell each seek to have damages paid equally by Gillen's Sons and Bull. Gillen's Sons would apportion any damages in thirds, equally against Bull, Gillen's Sons and Dalzell. Bull would impose all liability, and, hence, all burden of payment, on Gillen's Sons.

Before entering into a discussion of the various legal principles applicable to the case at bar, it might be well to point out that this case *does not* involve one of the following:

(a) A collision between two moving vessels, where both are at fault. The historical basis of equal apportionment

3. See Bisso v. Inland Waterways Corp., 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911. For an interesting discussion of the problems presented in interpreting and attempting to apply the Bisso doctrine to cases involving both towage and pilotage, see Judge Aldrich's opinion on rehearing in National Distillers Products Corporation v. Boston Tow Boat Company, D.C.D.Mass.1955, 134 F.Supp. 194, 200 et seq.

between the two such colliding vessels was set forth by Mr. Justice Bradley in The North Star, 1882, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91. See also The Max Morris, 1890, 137 U.S. 1, 8, 11 S.Ct. 29, 34 L.Ed. 586.

(b) A situation in which a tug, a tow without power and a ship are to blame for a collision between the tug or tow and the ship. In such case, the tug and tow have been considered as one vessel and obliged to contribute one-half, the remaining half being borne by the ship. See cases cited by counsel in The Eugene F. Moran, 1909, 212 U.S. 466, 468, 29 S.Ct. 339, 53 L.Ed. 600.

■ The remedy of Pennsylvania as libellant here is substantially the same in admiralty as in law. In both it is entitled to an entire compensation from the wrongdoers. The respondents are liable severally as well as jointly for the entire amount of the damages. The Atlas, 1876, 93 U.S. 302, 316, 23 L.Ed. 863; The Juniata, 1876, 93 U.S. 337, 340, 23 L.Ed. 930.

In The "Atlas," supra, Mr. Justice Clifford wrote:

"Common-law remedies in cases of tort, as given in common-law courts, and suits in personam in the admiralty courts of this country, bear a strong resemblance to each other in respect to parties, and the effect of a recovery by the injured party against one or all of the wrong-doers, and the extent of redress to which an innocent party is entitled against the wrong-doer. Simpson v. Hand, 6 Whart. [Pa. 311] 321.

"Different systems of pleading and modes of proceeding prevail in the two jurisdictions, and in some few respects there is a difference in the rules of evidence adopted in the admiralty court from those which prevail in common-law actions. All know that the libel in the Admiralty Court takes the place of the declaration in an action at law, and that the answer is the substitute for the plea of the defendant.

"Contributory negligence on the part of the libellant cannot defeat a recovery in collision cases, if it appears that the other party might have prevented the disaster, and that he also did not practise due diligence, and was guilty of negligence, and failed to exercise proper skill and care in the management of his vessel. Proof of the kind will defeat a recovery at common law; but the rule in the admiralty is, that the loss in such a case must be apportioned between the offending vessels, as having been occasioned by the fault of both; but *the rule of the common law and of the admiralty is the same where the suit is promoted by an innocent party, except that the moiety rule may be applied in the admiralty, if all the parties are before the court, and each of the wrong-doers is able to respond for his share of the damage. Subject to that qualification, the remedy of the innocent party is substantially the same in the admiralty as in an action at law, the rule being, that in both he is entitled to an entire compensation from the wrong-doer for the injury suffered by the collision. Colegrove v. [New York & N. H.] Railroad [Co.], 20 N.Y. [492] 493; Catlin v. Hills, 8 C.B. 125; Vanderplank v. Miller, 1 Moo. & Mal. 169.*" The "Atlas," 93 U.S. 302, 316–317. (Emphasis supplied.)

Mr. Justice Clifford further said:

"Parties without fault, such as shippers and consignees, bear no part of the loss in collision suits, and are entitled to full compensation for the damage which they suffer from the wrong-doers, and they may pursue their remedy in personam, either at common law or in the admiralty, against the wrong-doers or any one or more of them, whether they elect to proceed at law or in the admiralty courts." 93 U.S. at page 319.

■ The duty of care required of a pilot is well defined in the law. Pilots and navigators are required to consult

and to utilize available weather reports. See Charles Pfizer & Co., Inc., v. Conners Marine Co., Inc., 2 Cir., 1949, 175 F.2d 213, 215; The L. V. 472, D.C.E.D. N.Y.1945, 62 F.Supp. 152, 154. In the case at bar, neither the master of the Beatrice nor Mattisen checked the available weather reports.

The pilot must know the capacity of his tug in the then-existing state of wind and water. The Charles B. Sanford, 2 Cir., 1913, 204 F. 77; The E. T. Williams, 2 Cir., 1905, 139 F. 231; The J. S. T. Stranahan, D.C.S.D.N.Y.1907, 151 F. 364, affirmed 2 Cir., 1908, 165 F. 439. Here, Mattisen, the pilot in charge, did not inquire as to the Gillen's rudder and engine speed adjustments.

█ Misjudgment by a pilot, who is, or under the circumstances ought to be, aware of dangers and who then decides to take the chance, constitutes negligence. Holcomb v. The Adam E. Cornelius, 7 Cir., 1954, 212 F.2d 719; The Morristown, 2 Cir., 1925, 9 F.2d 391. Here, Captain Mattisen misjudged the danger to the Barge 416 resulting from the close proximity of the port side of the flotilla to the outboard side of the barge. He also misjudged the tendency of the wind to bear down upon the starboard quarter of the Beatrice and to set the vessel down to port. In my opinion, under the circumstances of this case, such misjudgment constituted negligence.

Therefore, one of the issues to be determined is whether the Bull interests or Dalzell, or both, are liable to the libellant for the negligence of Captain Mattisen as set forth in Finding No. 19.

There are a number of cases in which a vessel has been held liable in rem for negligence in navigation by a tugmaster while acting as pilot on board the vessel. For example, in The Helen, 2 Cir., 1924, 5 F.2d 54, a collision occurred as a result of negligence in navigation by a tugmaster while acting as pilot on board The Helen. The Court of Appeals, in part reversing the decision of the lower court, held The Helen liable in rem, stating:

"* * * The defense that the master of one of the tugs was on the bridge in command is insufficient because he was acting as a pilot hired voluntarily by the owners of the Helen, and as to third parties the Helen is responsible for damages caused by fault in her navigation. * * *" 5 F.2d at page 55.

See also Logue Stevedoring Corp. v. The Dalzellance, 2 Cir., 1952, 198 F.2d 369; The Maren Lee, 2 Cir., 1922, 278 F. 918.

Similarly, there are cases in which a towing company has been held responsible for the negligence of its tugmaster in maneuvering a flotilla from the bridge of the vessel being assisted. See Publicker Industries, Inc., v. Tugboat Neptune Co., 3 Cir., 1948, 171 F.2d 48; The People of the State of California v. The Jules Fribourg, D.C.N.D.Cal.1956, 140 F.Supp. 333.

In Patterson Oil Terminals, Inc., v. The Port Covington, D.C.E.D.Pa.1952, 109 F.Supp. 953, affirmed 3 Cir., 1953, 205 F.2d 694, both the shipowner and towing company were held liable for a collision between the ship and a dolphin belonging to the libellant. The ship was being assisted by two tugs and was piloted by the master of one of the tugs. The following language by Kirkpatrick, Chief Judge, is particularly pertinent:

"As to the responsibility of the respondents I think it must be put upon both Black Diamond Steamship Corp. and Curtis Bay Towing Co. The presumption of negligence arising from a vessel's collision with a stationary object operates against all parties participating in the management of the vessel at all times when negligent management was a factor in causing the collision. During the maneuvering of the vessel in the effort to break the sheer, the captain was present on the bridge and if what the pilot did appeared to be insufficient or wrong he could have corrected or countermanded the pilot's orders. Before the vessel left her anchorage either party could

have insisted upon an additional tug. The pilotage clause by which the docking pilot became the servant of the vessel and her owners does not affect the tort liability of the parties to the libellant, whatever its effect may be as between the two parties to the contract. See Publicker Industries, Inc., v. Tugboat Neptune Co., 3 Cir., 171 F.2d 48." 109 F.Supp. at page 955.

As in the Port Covington case, supra, the collision in the case at bar occurred while the flotilla was under the direction of Captain Mattisen, Dalzell's tugmaster, who was acting as pilot on board the Beatrice. Captain Hudgins of the Beatrice was on the bridge along with Mattisen, in his own words, "To see that my vessel was taken care of." If what Mattisen did appeared to be insufficient or wrong, Captain Hudgins could have corrected or countermanded Mattisen's orders. However, Captain Hudgins was of the opinion that "neither I nor anybody else could have done any better." Under these circumstances, I have concluded that the Beatrice and Bull, its owner, are liable to the libellant for damages caused by fault in navigation of the Beatrice.

■ I have also concluded that Dalzell is responsible to the libellant for the negligence of Captain Mattisen. Manifestly, Mattisen's status as a pilot was interrelated with and formed an essential element of his employment as a tugmaster for Dalzell. In my opinion, Captain Mattisen did not lose his identity as an employee of Dalzell while performing pilotage duties on board the Beatrice. Therefore, his negligence may be imputed to Dalzell so that, at least in the first instance, Dalzell will be required, along with Bull and Gillen's Sons, to bear an equal portion of the damages awarded to libellant.

■ While the so-called "pilotage clause," above mentioned, may be determinative of the rights and obligations of Bull, the Beatrice and Dalzell inter esse, it cannot absolve Dalzell from liability to the libellant, nor is it binding upon Gillen's Sons, since neither libellant nor Gillen's Sons was a party to the agreement. See Sun Oil Co. v. Dalzell Towing Co., Inc., 1932, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311; Publicker Industries, Inc., v. Tugboat Neptune Co., 3 Cir., 1948, 171 F.2d 48; The People of the State of California v. The Jules Fribourg, D.C.N.D. Cal.1956, 140 F.Supp. 333; Patterson Oil Terminals, Inc., v. The Port Covington, D.C.E.D.Pa.1952, 109 F.Supp. 953, affirmed 3 Cir., 1953, 205 F.2d 694; The Niels R. Finsen, D.C.S.D.N.Y.1931, 52 F.2d 795; Robins Dry Dock and Repair Company v. Navigazione Libera Triestina, S.A., 1933, 261 N.Y. 455, 185 N.E. 698.

■ The law is well settled that in a collision between a vessel in motion and a stationary object or vessel at rest, the former is presumptively at fault. For example, in The Granite State, 1865, 3 Wall. 310, 70 U.S. 310, 18 L.Ed. 179, which involved a collision between a steamer and an anchored barge, Mr. Justice Grier stated:

"* * * we are not called upon to inquire wherein the steamboat was not managed with proper nautical skill; whether the bright light which the steamboat had, or ought to have had, was not sufficient to warn her in time of her proximity to the pier if careful watch had been kept; whether she should not have backed her engine instead of rushing forward; whether she should have ported or starboarded her helm. All these inquiries are superfluous where the collision was caused by a vessel having the power to move or stop at pleasure in a channel of sufficient breadth, without any superior force compelling her to the place of collision. The fact that in these circumstances the steamboat did collide with the barge is conclusive evidence that she was not properly managed, and that she should be condemned to pay the damages caused by the collision." 3 Wall. at page 314, 70 U.S. at page 314.

The Gulf of Mexico, 2 Cir., 1922, 281 F. 77, similarly involved a collision be-

tween a steamship and an anchored vessel. The Court of Appeals there stated:

"The Corning came into collision with an anchored vessel, and is presumptively at fault. It was a clear night, and there is no claim of a foul berth. Vessels in motion are required to keep out of the way of vessels at anchor, and the latter are without fault, unless it appears that the collision was the result of unavoidable accident. If the latter, the rule is that a vessel in motion must exonerate herself from blame by showing that it was not within her power to prevent the collision by adopting any practical precautions. The Virginia Ehrman (Agnese), 97 U.S. 309, 24 L.Ed. 890; The Granite State, 3 Wall. 310, 70 U.S. 310, 18 L.Ed. 179; The Bridgeport, 14 Wall. 116, 81 U.S. 116, 20 L.Ed. 787." 281 F. at page 79.

In The Edward A. Uhrig, D.C.W.D. N.Y.1925, 9 F.2d 185, a steamer, while being assisted by a tug, collided with a moored sandsucker. A presumption of fault was held to attach both to the steamer and to her assisting tug, though the libel against the tug was ultimately dismissed. The following language from the opinion of Hazel, J., is pertinent:

"* * * The navigating tugboat and steamer were presumptively at fault, since the duty rested upon them of keeping clear of her. Even if the impact were to be considered an unavoidable accident, the steamer and tug nevertheless were required to exonerate themselves from blame by proving they were powerless to prevent the contact by using ordinary precautions. The Gulf of Mexico, 2 Cir., 281 F. [77] 79. Both the tugboat and the steamer, of course, were aware of the presence of the Excavator at her dock, and her propinquity to the drawbridge. Accordingly commensurate care, precaution, foresight, and skill were required to meet the conditions of safely passing her." 9 F.2d at page 186.

In Patterson Oil Terminals, Inc., v. The Port Covington, D.C.E.D.Pa.1952, 109 F.Supp. 953, affirmed 3 Cir., 1953, 205 F.2d 694, a vessel, assisted by two tugs, struck a dolphin. Chief Judge Kirkpatrick held both the owner of the ship and the towing company liable, stating:

"'When a moving vessel strikes a stationary object, such as a wharf, an inference of negligence arises and the burden is then upon the owners of the vessel to rebut the inference of negligence.' General Petroleum Corp. of California v. City of Los Angeles [Hokenesan Maru], Cal. App., 109 P.2d 754, 756.

"The common sense behind the rule makes the burden a heavy one. Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient for the respondent to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testimony of the witnesses, what was done was too little or too late or, if not, then the vessel was at fault for being in a position in which an unavoidable collision would occur. (109 F.Supp. at page 954.)

* * * * * *

"I am of the opinion that the respondents have not met the burden of disproving negligence which the law casts upon them.

"As to the responsibility of the respondents I think it must be put upon both Black Diamond Steamship Corp. and Curtis Bay Towing Co. The presumption of negligence arising from a vessel's collision with a stationary object operates against all parties participating in the management of the vessel at all times when negligent management was a factor in causing the collision. * * *" 109 F.Supp. at page 955.

In the case at bar, Barge 416 was moored and the Beatrice and Gillen were under motion. The damage to the barge occurred as a result of the Gillen becoming wedged between the barge and the Beatrice. The flotilla could have been safely maneuvered past the 416. Therefore, the accident was by no means inevitable. Under these circumstances, a presumption of fault arose against the Beatrice and the Gillen and their owners, and also against Dalzell, whose captain was directing the maneuver. The burden of proof was upon each of the respondents to show that it was without fault or that the contact with Barge 416 was occasioned by the barge's own fault. The respondents have not sustained their burden. On the contrary, as is more specifically set forth in Findings 19, 20, 21 and 24, the evidence establishes that negligence on the part of each of the respondents contributed to the collision and consequent damage to the libellant's barge.

There is insufficient proof by the respondents to establish that any alleged intervening negligence of the libellant caused the sinking of the 416. The absence of Omundsen, the bargee, on a legitimate errand, was but temporary for perhaps 30 minutes, with no reason to foresee any immediate danger to the moored barge. Claims of respondents that if Omundsen had been present the barge could have been pumped out, are, in my opinion, without foundation. The facts do not sustain this contention. The presence of the bargeman would not have avoided the sinking. The court under such conditions fixes no responsibility upon the libellant for the subsequent sinking merely because of such absence. New York, New Haven & Hartford Railroad Co. v. Erie Railroad Co., 2 Cir., 1952, 197 F.2d 148. See also The Kathryn B. Guinan, 2 Cir., 1910, 176 F. 301. Cases such as United States v. Carroll Towing Co., 2 Cir., 1947, 159 F.2d 169, 174, involving extended absence, do not apply here.

From the foregoing and as heretofore found, it appears that at least three causal factors contributed to the damage and subsequent sinking of libellant's Barge 416:

(1) The negligence of the master and employees of the Gillen, as a result of which the Gillen came directly in contact with the 416.

(2) The negligent navigation of the Beatrice and the failure of its deck hands to promptly cast off, as a result of which the Beatrice pushed the Gillen against the 416.

(3) The negligent direction of the flotilla by Captain Mattisen.

Therefore, the Gillen and its owner, the Beatrice and its owner, and Dalzell through the pilot or tug captain, all contributed to the injury sustained by the libellant.

Nevertheless, the libellant (arguing here as amicus curiae) contends that the Gillen and Gillen's Sons should pay one-half, and that the other half should be paid by the Beatrice and Bull. With this contention this court cannot agree. There were three groups of parties or interests involved. The innocent party, the owner of Barge 416, is entitled, as hereinbefore stated, to hold all of these three parties or interests jointly and severally. I do not believe there are any principles of admiralty or of common law which require otherwise.

It is said that "In admiralty the vessel has a juridical personality, an almost corporate capacity, having not only rights but liabilities (sometimes distinct from those of the owner) which may be enforced by process and decree against the vessel, binding upon all interested in her and conclusive upon the world, for admiralty in appropriate cases administers remedies *in rem*, *i. e.*, against the property, as well as remedies *in personam*, *i.e.*, against the party personally." 1 Benedict on Admiralty, Sixth Ed., p. 3. However, it would appear that a seizure in rem is designed primarily to acquire (1) jurisdiction and (2) a lien. "An admiralty court by seizure *in rem* acquires jurisdiction of all interests in the *res* and by decree *in rem* binds all." 1 Bene-

dict on Admiralty, Sixth Ed., p. 21. In cases of maritime tort the law considers that the wrong gives the person who has suffered thereby, a right to look to the ship for his remedy. 1 Benedict on Admiralty, Sixth Ed., p. 23. This court, however, has found no authority to the effect that, in a proceeding based on both in rem and in personam jurisdiction, a divisional apportionment of damages must relate solely to the number of vessels involved.

 The fiction that a vessel may be a wrongdoer is well established in our law. However, as was stated by Mr. Justice Holmes in The Eugene F. Moran, 1909, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600:

"* * * But, after all, a fiction is not a satisfactory ground for taking one man's property to satisfy another man's wrong, and it should not be extended." 212 U.S. at page 474, 29 S.Ct. at page 340.

Accordingly, it is my determination that the Beatrice and Bull, the Gillen and Gillen's Sons, and Dalzell are each jointly and severally liable to the libellant for the sinking of the Barge 416 and that each of the three parties or interests involved herein shall bear one-third of the loss.

There still remains to be considered the cross-claim by Dalzell against Bull for indemnification by reason of the Pilotage Agreement between them.

 There is ample authority for characterizing the so-called "pilotage clause" as an indemnity agreement between shipowner and towing company with respect to damages resulting from negligence of the latter's master while he is performing duties which fall within the scope of the clause. See Robins Dry Dock and Repair Company v. Navigazione Libera Triestina, S.A., 1933, 261 N.Y. 455, 463, 185 N.E. 698; Moran Towing & Transportation Co., Inc., v. Navigazione Libera Triestina, S.A., 2 Cir., 1937, 92 F.2d 37, 38, certiorari denied 302 U.S. 744, 58 S.Ct. 145, 82 L.Ed. 575; Gypsum Queen-Tug Peerless, D.C.

E.D.Va.1953, 1953 A.M.C. 2071, 2077; Bonnewell v. United States of America, D.C.E.D.Va.1947, 1948 A.M.C. 842, 844, reversed on other grounds, 4 Cir., 1948, 170 F.2d 411.

For example, in Robins Dry Dock and Repair Company v. Navigazione Libera Triestina, S.A., supra, Crouch, J., in discussing the legal effect of a pilotage clause, stated:

"* * * It is analogous to an indemnity agreement or to an agreement securing exemption from liability for loss or damage caused by a party's own negligence. As such it has been held to be valid. Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311." 261 N.Y. at page 463, 185 N.E. at page 700.

In Moran Towing & Transportation Co., Inc., v. Navigazione Libera Triestina, S.A., supra, which was an indemnity action by a towing company against a shipowner based upon a pilotage clause, Augustus N. Hand, Circuit Judge, stated:

"* * * In the present case N.L.T., by agreeing with Moran that the tugmaster should become its servant, in effect undertook to perform a maritime service and to indemnify Moran for any damage sustained by the tugmaster's negligence." 92 F.2d at pages 38-39.

 The pilotage clause must, of course, be strictly construed against the towing company and should be given no broader interpretation than its language clearly requires. See The People of the State of California v. The Jules Fribourg, D.C.N.D.Cal.1956, 140 F.Supp. 333, 340; National Distillers Products Corporation v. Boston Tow Boat Co., D.C.D.Mass. 1955, 134 F.Supp. 194, 200 (footnote 5); Lane v. Celanese Corp. of America, D.C. N.D.N.Y.1950, 94 F.Supp. 528, 530.

 Therefore, a towing company is not entitled to indemnification for loss which results from its own negligence independent from that of its tugmaster. See Gypsum Queen-Tug Peerless, D.C.E.

D.Va.1953, 1953 A.M.C. 2071, 2077. Nor is a towing company entitled to indemnification where the negligence of its tugmaster does not come within the scope of the activities specified in the pilotage clause. The following language from the decision in The People of the State of California v. The Jules Fribourg, D.C.N.D.Cal.1956, 140 F.Supp. 333, is pertinent in this regard:

"The second reason for the inapplicability of the pilotage clause is that it does not in terms embrace the negligent act of Captain Markley. Being a release-from-liability clause it should be given no broader interpretation than its language clearly requires. The clause states that a tug captain acting as pilot aboard a vessel shall be deemed the servant of the vessel owner 'in respect to the giving of orders to' any assisting tugs and 'in respect to the handling of such vessel,' and the tug company shall not be responsible for any damages resulting therefrom. Captain Markley was not negligent in respect to any order given the assisting tug nor in respect to the handling of the Jules Fribourg. His sole act of negligence was his failure to order a second tug for use in case of need. In a broad sense the failure to order a second tug might be said to constitute neglect in the handling of the Jules Fribourg. But narrowly construed, the term 'handling of such vessel' can mean no more than the directing of the movements of the vessel itself.

"In view of these conclusions with respect to the pilotage clause it cannot be effective either to relieve the tug company from liability or to impose liability on the owner of the Jules Fribourg." 140 F.Supp. at page 340.

The liability of Dalzell to the libellant in this action results solely from the negligence of Captain Mattisen in the respects set forth in Finding No. 19. In my opinion, all of the negligent acts of Captain Mattisen came directly within the scope of the pilotage clause here involved, or were so interrelated with Mattisen's direction of the flotilla while on board the Beatrice as to be inseparable therefrom.

Accordingly, I hold that Dalzell is entitled to indemnity from Bull for any recovery by libellant against Dalzell.

Conclusions of Law

1. This court has jurisdiction of the subject matter of this suit and of the parties hereto.

2. This suit is within the admiralty and maritime jurisdiction of this court.

3. The Tug Lester J. Gillen and the S.S. Beatrice were within the jurisdiction of this court at the time of the institution of this action and at the time of damage upon which the action is based.

4. Libellant is entitled to an interlocutory decree to sustain its claim for liability against the Tug Lester J. Gillen in rem and its owner, Henry Gillen's Sons Lighterage, Inc., in personam.

5. Libellant is entitled to an interlocutory decree to sustain its claim for liability against the S.S. Beatrice in rem and against its owner, A. H. Bull Steamship Co., Inc., in personam.

6. Libellant is entitled to an in personam interlocutory decree against Dalzell Towing Co., Inc.

7. The Tug Lester J. Gillen and its owner shall bear one-third of the damages to which the libellant is entitled; the S.S. Beatrice and its owner shall also bear one-third; and the Dalzell Towing Co., Inc. shall bear one-third of said damages. Any balance which the libellant is unable to collect or enforce against one or more of the respondents shall be paid by the remaining respondents.

8. The cross-claim for indemnity by Dalzell Towing Co., Inc. against A. H. Bull Steamship Co., Inc. is granted and A. H. Bull Steamship Co., Inc. shall reimburse Dalzell Towing Co., Inc. for any damages paid by it to the libellant herein.

9. The libellant is entitled to a provision in the said interlocutory decree providing for the reference to a Com-

missioner of the damages to which it is entitled, with costs (to libellant only), and interest, if any, as determined by this court, upon the entry of the final decree herein.

Submit decree on notice in accordance with the foregoing.