**INTERNATIONAL TERMINAL OPER- ATING CO., Inc., Libelant,**

v.

**NAVIERA AZNAR, S.A. (sometimes known as the Aznar Line), THE S.S. MONTE URQUIOLA, THE Tug FRAN- CES TURECAMO, B. Turecamo Tow- ing Co., B. Turecamo Coastal & Har- bor Towing Corporation, THE Tug KATHLEEN TRACY and the M. & J. Tracy, Inc., Respondents.**

United States District Court
S. D. New York.

March 16, 1961.

Alexander, Ash & Schwartz, by Nich- olas Milano, New York City, for libelant.

Dawson & Waaland, by Thorolv T. Waaland, New York City, for respond- ent Naviera Aznar.

Hill, Rivkins, Middleton, Louis & War- burton, by Thomas P. Pender, New York City, for respondents B. Turecamo Tow- ing Corp. and B. Turecamo Coastal and Harbor Towing Corp.

Macklin, Speer, Hanan & McKernan, by John C. Hart, New York City, for

respondent M. & J. Tracy, Inc. and claimant W. J. T. Towing Line, Inc. and Tug Kathleen Tracy.

THOMAS F. MURPHY, District Judge.

This proceeding *in rem* and *in personam* arises out of the damage to libelant's dock in Hoboken where the S. S. Monte Urquiola was moored and undocking on August 19, 1958, under its own power and with the assistance of two tugs.

Libelant sues the ship, the owners of the ship, and the tugs Frances Turecamo and Kathleen Tracy and their respective owners. At the beginning of the trial there was a concession that the libelant was the owner of the dock and respondents were the owners of the ships and tugs involved except that M. & J. Tracy, Inc. was conceded to be not the owner of the Kathleen Tracy but another Tracy Company was, and it was substituted in lieu thereof and the libel dismissed against M. & J. Tracy, Inc.

The ship was moored bow end in to the south side of Pier 9 so that its starboard side was next to the pier. The tide was ebbing and the wind moderate from the south or southwest. The time was about 7:15 p. m. One eye-witness, a tug captain who was standing on the bulkhead at the time, testified that at the beginning of the undocking operation the two tugs took positions at right angles to the ship, the Tracy tug into the port quarter and the Turecamo tug into the port bow. As the ship was moving astern he noticed that the Turecamo tug was pushing and he yelled to the foreman on the pier that it was going to hit the pier and the foreman yelled "no" that the fenders would stop it. In any event the ship's rake hit the steel girders and damaged the pier's superstructure. He testified, also, that as the stern of the ship was going down stream the bow was pushed into the dock, and although he did not see any of the fenders break loose he knew that one had broken loose because he picked it up later and brought it back, though he could not say whether it was the one that was inshore or outshore.

The other eye-witness was an employee of the shipping company agent, who testified that the line from the Turecamo tug to the ship was slack and she was making no quick water. In other words, instead of pulling the bow out she permitted it to go in as the stern went out causing it to hit the pier.

Libelant's employee on the pier, i. e., the foreman who had charge of the lines, said that he was told by the mate on the ship to let go of the lines and as he saw the ship coming closer to door No. 12 where he was standing on the stringpiece, he ran away and when he came back he noticed that the ship had taken one of the fenders with it. The lines that moored the fenders were 4″ in diameter. He said he never saw a ship pull out so fast.

The respondents' witnesses were, first, the captain of the ship, who said that he transferred the orders from the undocking pilot to the third officer; he said that when the pilot came aboard and everything was in readiness he so advised the pilot and was told to cast off all the lines. The pilot then gave the order for half-speed astern which is about 5½ to 6 knots or 40 revolutions. He testified further, that he did not understand the signals that the pilot gave to the two tugs, one by the ship's whistle and one by mouth whistle; that he could not see the tug under the bow but he could see the stern tug and it appeared to be keeping the ship against the current; that he saw one of the fenders broken and floating with its moorings; that the pilot gave an order for a right rudder and that the pilot's orders were correct; that his ship had a draft of 17′ aft and 12′ forward and was on an even keel. On cross-examination he said that the "half-speed astern" order was the only order given until the accident; that the order for a starboard rudder was after the accident; that the fender became loose a few seconds before the accident, and that at no time could he see the tug on the port bow. He testified that the ship is 148 meters long or 475′ and the pier on the south side 624′. It was a motor ship with one

propeller and he admitted that in motion astern it has a tendency to go to its port.

The next witness for the ship was the company agent's employee who, in addition to what he testified to above, said that when he gave the order for the tugs to the tug dispatcher, they agreed on the undocking time to be one-half hour before mean low water and the dispatcher said this would be O.K. with the two tugs. He also testified that the Tracy tug was doing all it could do and that the stern was down the river despite the work of the Tracy tug.

By stipulation Exhibit B was offered in evidence, which embodies the contract between the ship and Turecamo and contains the pilotage clause relieving the towing company of liability in certain instances. It provides:

"When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom."

The undocking pilot, Captain Joseph French, who worked for Turecamo at the time, testified that he gave the order for the two tugs to take a position heading into the bow and stern and that he gave them the signal to work ahead slowly when the lines were let loose. He said he gave the orders for *slow astern* and that was executed. He then stopped the Turecamo tug by one whistle and gave the Tracy the signal of two whistles for full-speed but when he saw the bow going into the pier he gave a two-blast signal

to the Turecamo tug to go astern, which was acknowledged, but he could not see whether the order was carried out and the ship continued astern but the bow fell toward the pier. He then gave a hard right rudder order and the collision happened. After the ship was out in the stream he came back to help with the fenders and found that the one nearest the bulkhead had broken loose. He admitted in his examination before trial, and we find as a fact, that the lashings on the fenders broke due to the weight of the ship and the canting of the fender, just about the time of the collision; on trial, he said, just before the collision. In this examination he all but admitted that the accident happened because the Turecamo tug should have been able to, but failed to, hold her bow off the pier. She had enough power—1664 horsepower. He said that the stern of the ship was very near the end of the pier when they started and it was about one-quarter of the ship's length into the stream at the time of the accident and that the hard right rudder order was given about 30 seconds before the accident.

Captain Lyons who remained in charge of the tug Frances Turecamo also testified, and admitted that it was his job to keep the bow of the ship off the pier. He said he received one signal to come ahead slowly and another signal to stop and he started to drift under the bow when he received a signal to go full astern but he said he could not, and heard a noise and he was pulled under the bow.

Tracy produced two witnesses who did not testify but were offered for examination by any one. They were the alternate captain on the Tracy tug (the captain having died) and a deckhand.

The Turecamo's claim indemnity over against the shipowner under the pilotage clause, if held liable, and the ship's answer was amended also to plead indemnity, over against the Turecamo people.

The ship's log books were introduced (translations, as they were in Spanish) and they tended to support the captain and not the undocking pilot. In substance they say that at 19:15 the ship

went one-half astern; at 19:19 it stopped and went slow astern, and at 19:20 when it was out in the stream it stopped again.

According to the logs it also appears that the accident happened at exactly 19:18 and it is described by the captain as "in view of a strong ebb tide and despite our efforts and the efforts of the tug boats we touched the pier."

It is the settled rule in admiralty that when a vessel comes in contact with a stationary object, there arises a presumption of negligence which operates against all parties participating in the management of the vessel at the time of the contact. Patterson Oil Terminals, Inc. v. The Port Covington, D.C., 109 F. Supp. 953, 954–955, affirmed 3 Cir., 1953, 205 F.2d 694. The burden rests upon those parties to rebut that presumption. We are satisfied from the evidence presented that the presumption has been sufficiently rebutted only as respects the Tracy tug and that, therefore, the libel must be dismissed as against that tug and its owners and libelant is entitled to a decree against all other parties.

We find the pilot at fault in at least two respects, and through him, the vessel and its owners as well as the pilot's employer, Turecamo Coastal and Harbor Towing Corporation, who contracted to undock the vessel. Pennsylvania Railroad Company v. The Beatrice, D.C., 161 F.Supp. 136, 146–148, affirmed 2 Cir., 1960, 275 F.2d 209. The pilot was negligent in ordering the vessel to proceed astern at half-speed which, under the circumstances, was improvidently fast; he was also at fault in failing to exercise due care to see that the tug Turecamo was properly positioned to perform its function in the maneuver of keeping the bow of the ship away from the pier. From the testimony it appears that when he saw the bow of the vessel falling into the pier he ordered the Turecamo to go astern, and while that was a proper order it was given too late for effective compliance therewith.

The pilot's negligence in handling the ship during the undocking operation was, of course, imputable to the ship vis-à-vis libelant. The Helen, 2 Cir., 1924, 5 F.2d 54. But cf. Gypsum Queen —Tug Peerless, 1953 A.M.C. 2071, 2078; Logue Stevedoring Corp. v. The Dalzellance, 2 Cir., 1952, 198 F.2d 369, 373, (dissenting opinion). We find, too, that the Turecamo tug was at fault also and its fault contributed to the accident. Each tug, while under the general supervision of the pilot aboard the steamship, nevertheless acted independently and was obligated to so act insofar as its assigned duty or part of the maneuver was concerned. See The Edward G. Murray, 278 F. 895, 897. The Turecamo's part of the work was to keep the bow off the pier. We find that it failed to exercise due care to avoid that contact which was plainly foreseeable and which good seamanship in performance of its task would have avoided. Cf. Gypsum Queen—Tug Peerless, supra, at 2078. Its fault created thereby independent liability *in rem* against the tug and *in personam* against its owner.

Insofar as we are concerned with the liability of the Turecamo tug, the steamship, and the owners of those two vessels to libelant, there is really no problem. There appeared to be a problem with respect to the cross-claims for indemnity but in view of our finding of independent fault on the part of the Turecamo tug, it has resolved itself.

With reference to the pilotage clause, the pilot was negligent, certainly with respect to "the handling of such vessel" and, arguably, with respect to "the giving of orders" to the tug Turecamo. He was also negligent in the use he made of that tug in the undocking procedure. In any event, his faults first mentioned are clearly within the purview of the pilotage clause and therefore operate to preclude indemnity in favor of the shipowner, because by virtue of that clause the pilot was the "servant" of the shipowner for the purpose of those actions. Cf. The West Eldara, 2 Cir., 1939, 104 F.2d 670, 671. If the faults of the pilot that are within the scope of the pilotage clause were the only basis for

imposing liability upon the towing company that party would be entitled to indemnity from the shipowner in accordance with the terms of the towing contract. That is not the sole basis of the liability of the towing company however; at least the separate fault of the Turecamo tug operates to prevent the award of such indemnity.

In accordance with the foregoing the libel is dismissed as against the Tracy tug and its owners, and as to the remaining respondents, libelant is entitled to a decree in its favor holding them jointly and severally liable.

Settle decree with a provision for apportionment of damages equally between the ship interests and the towing company interests.

This memorandum is filed in lieu of findings of fact and conclusions of law.