**AMERICAN OIL COMPANY,**
**Plaintiff,**

**v.**

**M/T LACON et al., Defendants.**

**Civ. A. No. 2758.**

United States District Court,
S. D. Georgia,
Savannah Division.

Aug. 21, 1973.

**26.** See note 25 *supra*.

Walter C. Hartridge, II, and Edwin D. Robb, Jr., Bouhan, Williams & Levy, Savannah, Ga., for plaintiff.

W. Spencer Connerat, Jr., and Ralph O. Bowden, III, Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., for M/T Lacon and Owners.

Julian C. Sipple, Chamlee, Dubus & Sipple, Savannah, Ga., for Atlantic Towing Co. and Tug Calhoun.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAWRENCE, Chief Judge.

This admiralty action grows out of a collision that occurred about 7:30 P.M. on November 27, 1970, in which the Motor Transport *Lacon* struck the pier of American Oil Company which is located on the south bank of the Savannah River near Savannah. The *Lacon* is owned by a Liberian corporation. Another defendant is Atlantic Towing Company, owner of the tugs *Lawton M. Calhoun* and *Robert W. Groves* which assisted in the docking operation of the *Lacon*. At the time of the collision the latter vessel was being handled by a docking master furnished by Atlantic to the defendant shipowner.

American Oil Company sues for the cost of repairs to the pier and other damages and expenses in the total amount of around $107,000.

In its answer the shipowner contended that the sole cause of the collision was the breach by Atlantic Towing Company of its implied warranty to perform the docking operation in a workmanlike manner and with a seaworthy tug. It filed a cross-claim against Atlantic Towing Company on the same theory. In answering the original complaint Atlantic denied that the *Calhoun* contributed to the collision. The towing company cross-claimed against the *Lacon* for damages to the tug sustained during the docking operation.

## I—FINDINGS OF FACT

(1) Oceangoing vessels calling at the port of Savannah are met by a pilot boat and a licensed pilot. On the afternoon of the collision on November 27, 1970, Bar Pilot Joseph Ryan boarded the *Lacon* at the seabuoy. Atlantic Towing Company does not furnish bar pilot service and the vessel proceeded up the Savannah River under the direction of Captain Ryan.

(2) The business of Atlantic Towing Company includes that of providing tug and docking master services for the berthing and unberthing of vessels at Savannah. Customarily, the agent of the vessel notifies the towing company a day or two in advance of the arrival of a vessel requiring such services and such appears to have been the procedure in the case of the *Lacon*.

(3) When the tanker reached the slip of Gulf Oil Company some distance downstream from the point of collision, she was met by the tug *Lawton M. Calhoun*. At that point James R. Strickland boarded the *Lacon* in the capacity of Docking Master. On reaching the bridge he handed the Master a copy of Atlantic Towing Company's Schedule of Rates, Terms and Conditions for Tug Services (Atlantic's Ex. #16). The Master signed another document submitted to him under which he acknowledged the services of the tugs *Lawton M. Calhoun* and *Robert W. Groves*. Exhibits 26–31 of Atlantic show prior occasions during 1970 in which the Master of the *Lacon* had acknowledged such docking services in accordance with the Conditions and Rates of the towing company. The Court will have occasion hereafter to deal with the legal effect of the "Rate Sheet" and the provision thereof under which Atlantic Towing Company immunizes itself from responsibility for damages to vessels as a re-

sult of acts or orders of its Docking Masters or from the docking or undocking of ships. It provides that when a Docking Master goes aboard a vessel assisted by a tug he becomes the servant of the shipowner. These documents were handed the Master of the *Lacon* around 5:10 P.M.

(4) When she reached the old Seaboard Coastline Railroad bridge about one-half mile or 2750 feet downstream from the pier of American Oil Company, Bar Pilot Ryan relinquished direction of the vessel's movements to Docking Master Strickland. Just before this was done, Captain Ryan ordered the *Lacon's* engine to be stopped. She had been proceeding at a speed of 7 or 8 knots. This order was transmitted by telegraph to the engine room. The tide which was flooding at about 2 knots lacked two hours of being high. The *Lacon* continued to move upstream.

(5) The Docking Master's order was relayed to the engine room by the mate who was in the pilot house.

(6) Shortly before Captain Strickland took over as pilot from Captain Ryan he ordered the two tugs to take station at the *Lacon's* port bow. It is customary for the tugs to make fast to the vessel by mooring line.

(7) Docking Master Strickland had informed the *Lacon's* Master that he planned to dock her on the starboard side. The pier runs parallel to the Savannah River. The operation in question requires a 180° clockwise turn of the vessel and utilization of the turning basin on the north side of the River across from American Oil Company's pier.

(8) A short distance downstream from the pier where the *Lacon* was to dock a shoal makes from the north bank of the River toward the channel. The shoal tends to cause vessels to sheer to port, that is, in the direction of American Oil Company's pier. In view of the flooding tide and the effect of the shoaling, Docking Master Strickland had decided to dock the *Lacon* in the manner described, an operation that is not unusual.

(9) About five minutes before the collision the *Calhoun* had been made fast to the *Lacon* by a 7½ inch dacron line. The two tugs stayed in communication with the *Lacon* by walkie-talkie.

(10) As a result of the continued sheer to port, Captain Strickland gave a "full astern" order to the mate. At the time of giving this direction Strickland was standing near the ship's Master on the port wing of the bridge and in full view of the mate and the telegraph. Directions were given in English. Mr. Strickland was under the impression that the mate, a Greek, understood the order. There is evidence that he did not. Meanwhile, the vessel continued to sheer to the left. The first order for "full astern" was followed by another. Apparently, it was not immediately complied with by the engine room. Bar Pilot Ryan who was in or near the wheel house then shouted in a loud voice, "Full astern." According to him, the mate thereupon passed the order below.

(11) From forty-five seconds to sixty seconds elapsed between the first "full astern" order and compliance with such signal.

(12) No testimony was presented by the shipowner from any officer or anyone in the engine room to explain the tardiness of response to the telegraph order. As a result of lack of prompt reaction Captain Strickland requested the mate to give the telegraph a jingle, indicating "emergency full astern." The mate did not comply, according to Strickland who then went over to the telegraph and gave it two or three quick jingles.

(13) By this time there was a very real emergency. Contact of the vessel with the dock was imminent. Meanwhile, the two tugs were pushing against the port bow of the *Lacon* in an effort to turn it away.

(14) The Docking Master had requested that the ship's anchors be drop-

ped in order to stop forward movement or to lessen the impact. The brake mechanism of the starboard anchor was defective or inoperative and the chain continued to pay out. The port anchor took hold but did not stop the *Lacon's* progress toward the dock.

(15) The Master of the *Calhoun* was ordered to back "full astern" in an attempt to soften the blow. The *Robert W. Groves* which had not been made fast to the port bow of the *Lacon* backed off in order not to impede the work of the other tug. At this point the tug *Calhoun* went aground near the south bank of the River and her dacron line parted on account of the enormous stress on it (around 60,000,000 pounds) as a result of the forward motion of the *Lacon*. Moments later the tanker's bow struck the extreme northeast corner of the pier at which she was to have docked. The impact resulted in minimal damage to the *Lacon* which was moving very slowly at the time. However, the force of the blow was sufficient to tear the steel pilings apart and move an entire section out into the berthing area.

## FINDINGS AS TO LIABILITY OF THE DEFENDANTS

### (A) SHIPOWNER

(16) Negligence on the part of the *Lacon* is abundantly established.

■■ To begin with, when a moving vessel collides with a fixed object, there is a presumption that she is at fault and a *prima facie* case of negligence by the ship in motion is established. *The Oregon*, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; *The Victor*, 153 F.2d 200 (5th Cir.); *Brown & Root Marine Operators Inc. v. Zapata Off-Shore Company*, 377 F.2d 724 (5th Cir.); *Ernest Construction Company v. Tug Commodore*, 294 F.Supp. 15, 18 (D.C.Ala.); *Patterson Oil Terminals, Inc. v. Port Covington*, 109 F.Supp. 953 (D.C.Pa.) aff'd, 205 F.

2d 694 (3rd Cir.); *International Terminal Operating Company v. Naviera Aznar, S. A.*, 198 F.Supp. 214 (D.C.N.Y.).

(17) Either there was faulty communication or reception of telegraphic orders or lack of response to orders by those in the engine room.

■ The shipowner presented no evidence to rebut or explain the failure to heed signals sent from the pilot house. Neither the mate, the Master of the *Lacon* nor anyone in the engine room testified. Failure to produce important witnesses in an admiralty action may raise the inference that the testimony would have been unfavorable to the party by whom they should have ben called. *Trans-Amazonica Iquitos, S. A. v. Georgia Steamship Company*, 335 F. Supp. 935 (D.C.Ga.); *O. F. Shearer & Sons v. Cincinnati Marine Service, Inc.*, 279 F.2d 68 (6th Cir.).

(18) I find that the shipowner and the *Lacon* are liable for the damages sustained by American Oil Company as a result of the collision (allision, it is sometimes called) of the vessel with the pier.

### (B) ATLANTIC TOWING COMPANY

Did Atlantic Towing Company negligently contribute to the collision and, if so, to what degree? In an earlier order by the Court in this case it dealt with the effect of the "borrowed servant" stipulation in the "Pilotage" arrangement between the shipowner and the towing company. See *American Oil Company v. Lacon*, 337 F.Supp. 1123 (D.C.Ga.).[1] I will come back to the matter of liability vis-à-vis the shipowner and Atlantic Towing Company in the event of a finding by the Court that the negligence of both contributed proximately to the collision with the pier. All that need be said at this time is that in its previous order this Court held that the "Pilotage" or "Exculpatory" clause

---

[1]. In another case, this Court has upheld the validity of the same "Exculpatory" clause involved here. See *Federal Steam Naviga-* *tion Company, Ltd. v. The Tug Savannah et al.*, 305 F.Supp. 1293 (D.C.Ga.).

does not insulate the towing company from liability to American Oil Company for negligence by a Docking Master.

■ Docking a vessel is not necessarily a mere routine operation. No matter how often such maneuver may have been safely and easily performed in the past it calls for, on each new occasion, a high degree of care on the part of those responsible for the operation.[2]

The Docking Master was directing the movement of a vessel with a net tonnage of 8,211 tons carrying a cargo of 19,412 long tons of crude oil. With such a mass in motion the forward progress of a vessel with a flooding tide cannot be arrested immediately. The capability of damage to a land installation even when such vessel is barely moving is great. Thirty, forty-five, sixty seconds can be a precious span of time. The sheering effect of the shoal running from the north bank toward the channel was known. A vessel that "smells" bottom has a tendency to move away from it.[3]

■ (19) The Docking Master followed customary procedures on taking over the "conn" of the *Lacon* a few minutes before the docking operation began. He is not supposed to play nursemaid to the ship's officers and crew. However, he is something more than a mere automaton.

In supervising and directing a demanding maneuver by a large vessel in a narrow, shoaled channel it cannot be assumed that everything will run smoothly. "Murphy's Law" is a good rule for a docking master to follow in such a case. It is important that he, the mate and ship's master understand each other and the proposed operation. Also important is making sure from the beginning that signals from the bridge will be understood and promptly trans-

mitted to the engine room and there responded to.

(20) The "Pilotage" clause is not relevant to Atlantic's duty to provide adequate equipment for assisting tugs. The dacron line from the *Calhoun* to the *Lacon* parted under stress when the tug went aground while backing in an effort to slow the tanker's momentum. However, the warranty-of-seaworthiness issue was settled at the conclusion of the trial. I then found that the line was suitable for the use intended.

(21) As earlier noted, the *Groves* was never made fast to the *Lacon*. As to this the towing company blames the tanker's crew. The fact remains that the tug was unable to help when help was needed. Whether it would have affected matters is speculative. The added power of the *Groves* may or may not have helped blunt the force of the impact. This Court is unable from the record before it to evaluate the effect of her assistance.

■ The aforementioned presumption of negligence arising from a vessel's collision with a stationary object "operates against all parties participating in the management of the vessel at all times when negligent management was a factor in causing the collision." In such cases, "the pilotage clause by which the docking pilot became the servant of the vessel and her owners does not affect the tort liability of the parties to the libellant, whatever its effect may be as between the two parties to the contract." *Patterson Oil Terminals, Inc. v. Port Covington*, 109 F.Supp. at 955. See also *International Terminal Operating Co., Inc. v. Naviera Aznar, S. A., supra* at 217; *Patterson Terminals, Inc. v. S. S. Johannes Frans*, 209 F.Supp. 705 (D.C. Pa.).

■ (22) I find that Atlantic Towing Company has failed to overcome

---

2. And this is especially true where an inflammable cargo is involved.

3. For a case in which a shoal in the same vicinity of the River was involved and

the sheering effect thereof see *Seaboard Airline R. Co. v. Pan-American Petroleum & Transport Co.*, 199 F.2d 761, 765 (5th Cir.).

the inference of negligence applying to it with respect to the actions of the docking master. There was no procedure on the *Lacon* for verbal acknowledgment of engine orders. A check of the indicators by the pilot or mate will divulge whether the engine room has received the order. It appears to be the custom here to observe the screw wash of the vessel to determine whether a reverse signal has been carried out rather than look at the reposition of the synchro indicators on the telegraph.

(23) Atlantic Towing Company failed to exercise, under all the circumstances, the degree of care required in a docking operation and by the demands of the particular occasion. It fell short in not foreseeing the possibility of an emergency and in failing to take adequate precautions or measures before same presented itself. Its negligence proximately contributed to the collision with the pier.

### RESPECTIVE PERCENTAGES OF FAULT BY DEFENDANTS

■ (24) The acts or omissions of the shipowner and towing company combined as the proximate cause of the collision and damage to the pier. I find that the *Lacon* and her owner are 75% at fault and that Atlantic Towing Company is 25%. Such a finding of proportionate negligence may be unnecessary to an adjudication of liability but the Court deems it advisable to make such a determination.

### DAMAGES

American Oil Company claims damages totalling $107,291.49 as a result of the collision. This includes the contract for repairs amounting to $66,094.20 plus the cost of replacing asphalt paving; barge rental; emergency repairs to the dock; rubber fender replacement; the United States Salvage Association bill, and hydraulic dredging work by Norfolk Dredging Company.

### (A) EMERGENCY REPAIRS

■ (25) As a result of the collision, steel pilings were bent out into the berthing area leaving a large opening that permitted back fill to be washed into the River. It seemed likely that continued erosion would result in the possible undermining of a small building and several utility poles near the damaged area. A local contractor was employed to make emergency repairs in the hope of straightening the protruding pilings and checking the loss of fill. This procedure necessitated use of tugs as well as land-based equipment. The opening was not closed but emergency work served to prevent loss of additional fill. The cost of the emergency work was $6,439.70.

### (B) PERMANENT REPAIRS

(26) American Oil Company employed United States Salvage Association to survey the damaged area at a cost of $843.09 (Pl. Ex. #17). Atlantic Towing Company employed a local marine surveyor to conduct an independent survey. A meeting with representatives of the defendants, officials of American Oil and Sayler Marine Construction resulted in an agreed contract price with Sayler of $66,094.80 for repairing the damaged dock.

(27) The repair of the dock required the cutting of the damaged pilings at the mudline and driving new pilings inside the ones cut. The repaired sections were then joined to the undamaged portions of the pier, creating an 18″ jog in the repaired section. The latter comprised approximately 16% of the linear footage of the entire pier. A new anchoring system was installed and the repaired section backfilled with sand. The repairs commenced in December, 1970, and were completed on or about March 13, 1971.

### (C) BARGE RENTAL

■ (28) American Oil rented barges which were moored in such a

manner that tankers could dock under temporary conditions. This required use of tugs to move the barges when incoming vessels were scheduled. There is a question concerning barge rental after February 1, 1971, which was the expected completion date. Rentals during this interim amounted to $2,750 in addition to what was anticipated. Otherwise, discontinuance of use of barges would have halted American's normal operations. The additional period of utilizing rented barges was justified. The total cost, $8,293.50, is reasonable. It is not subject to reduction of $2,750 for barge rental for one and one-half months beyond the time specified for completion by Sayler of the repair job.

### (D) DREDGING

(29) The opening in the pier caused the washing of backfill. When repairs to the dock were completed approximately 3,500 cubic yards of fill were placed behind the bulkhead. Some of the lost fill was recovered and was reused. Additional fill had to be hauled in. American claimed that 2,225 yards of fill were lost.

(30) Following the collision Atlantic was employed by American, as it had regularly been in the past, to perform agitation dredging around the pier. A minimum depth of approximately 27 feet had been maintained in the berthing area. The flow of the tides unquestionably resulted in removal of much of the fill which washed into the River.

(31) The 22-inch pipeline dredge *Pullen* owned by Norfolk Dredging Company was in this area. American Oil Company contracted with her owner to deepen the area adjacent to the pier. That type of dredging involves cutting material from the bottom and hydraulic equipment is necessary. A "mobilization-demobilization" cost of $20,000 is claimed. The dredging operation involved removal of 4,280 cubic yards of material from the berthing area at a total cost of $44,150.

(32) American Oil Company claims a dredging expense of $22,951, representing 51.99% of the total cost of hydraulic dredging.

(33) There was evidence that oyster shells were dredged by the *Pullen* from the berthing area (Pl. Ex. #14A–14P) and they were obviously part of the backfill of the bulkhead. However, soundings taken before Norfolk began dredging indicate that the berthing area had already been restored to its original depth.

(34) The agreement between Norfolk Dredging Company and American for dredging called for commencement of such work on or about July 17th. The contract therefor specified dredging "to a depth of 32 feet at mean low water over a distance of approximately 700 feet and up to a line 10 feet from the face of the dock." (Pl. Ex. #13). The area immediately adjacent to the dock was not hydraulicly dredged.

(35) It appears to the Court that the primary purpose of this dredging was to make the area deeper rather that to restore it to the previous depth. Plaintiff did not amend its complaint to seek the recovery of dredging costs until August 16, 1972. Under the evidence, this Court is unable and unwilling to find that the hydraulic dredging was necessitated by the collision and the resulting loss of fill.

### (E) REPAVING

(36) The area that was repaired was backfilled with sand which generally requires time to settle. For this reason, the cost of repaving was not included in the original contract with Sayler. American received several estimates. In 1972 American contracted with Claussen Paving Company to repave the surface in the vicinity of the dock that had been washed into the River. The cost was $2,450 which is reasonable.

### (F) FENDER

(37) It appears that an attempt was made to recover a rubber

fender lost as a result of the collision. The search was unsuccessful and a new one was installed at an expense of $500. Only the cost of the fender is at issue since the installation cost ($100) was included in the Sayler repair contract. The item sued for is allowed.

## (G) DEPRECIATION

(38) The American Oil Company dock was built in 1930. In determining its useful life various factors must be considered. Of importance is the reduction of thickness of the steel sheet piling as a result of corrosion over the years which affects its maximum bending strength. Another factor is the rate of corrosion. This bears in turn on the maximum life of the piling. The amount of stress placed thereon also plays a part in determining the time when the structure will become "unsafe".

(39) A representative of McArthur and Associates, consulting engineers, estimated that the dock had depreciated by 62.5% or 24 years of remaining service. (Defendants' Ex. #9). Lockwood Greene, architects and engineers, predicted an overall life of 55 years with 15 years remaining. This would indicate a depreciation of approximately 72%. (Defendants' Ex. #8). The survey by United States Salvage Association fixed depreciation at 60%. (Defendants' Ex. #4).

Huguenin Thomas who is a consulting engineer testified as an expert on behalf of American Oil Company. He sent samples of the steel pilings to Bethlehem Steel Company for analysis. The amount of corrosion was ascertained to be 25%. Mr. Thomas estimated depreciation at 50% with 30 to 35 years of life remaining out of an expectancy of 70 to 75 years. His estimate was based on projection of the present erosion, as so established, to the yield point.

(40) The average of the four depreciation estimates is approximately 63%.

American argues that the mathematical calculations used by experts on the other side do not take into account the lesser strain oyster-shell backfill imposes upon piling. The angle of repose of oyster-shell fill is greater than that of sandfill and does not impose as much stress on the bulkhead.[4]

Defendants contend that the rebuilt area of the pier (which is approximately 46 feet of a total riverside length of 200 feet and 20 feet of the east wing wall) has enhanced or bettered the structure as a whole because of use of higher grade steel. The enhancement claim presents two future possibilities. If American Oil replaces the damaged portion of the dock, there will be little expense as far as the newly-built section is concerned and that part of the normal cost of a total replacement would be saved. On the other hand, American contends that the future requirements of deeper draft vessels may necessitate replacement of the entire pier, including the new section. In that event, the owner would not benefit.

We cannot foresee what may be necessary or feasible twenty or thirty years hence. What the dock owner is entitled to is to be made whole for the damage to the pier as it existed at the time of the collision. However, plaintiff is not entitled to a new pier or new portion thereof. *Brooklyn Waterfront Terminal Corp. v. International Terminal Operating Co., Inc.*, 211 F.Supp. 702, 708 (D.C.N.Y.), aff'd 311 F.2d 221 (2nd Cir.). In computing damage for replacement or repair deduction for depreciation is made with few exceptions. *Seaboard Air Line Railroad Company v. Marine Industries, Inc.*, 237 F.Supp. 10, 13 (D.C.S.C.); *Elgin, Joliet and Eastern Railway Company v. American Commercial Line, Inc.*, 317 F.Supp. 175 (D.C.Ill.); *Patterson Terminals, Inc v. S.S. Johannes Frans, supra,* 209 F.Supp. at 710; *Hinfin Realty Corporation v.*

4. Sand was used because the oyster-sand combination is not available in large quantity.

*M/V Poling Bros. #7 et al.*, 348 F.Supp. 1391 (D.C.N.Y.).

The summary of Sayler Marine of the cost of repair to the dock of American Oil Company contains an item of $20,448 representing furnishing and driving 2,880 linear feet of steel piling. Plaintiff's answer to an interrogatory indicates that the cost of the steel without labor was $12,096 and the charge for driving piling, $8,346. The total cost of new piling and of labor is subject to depreciation. See *Seaboard Air Line Railroad Company v. Marine Industries, Inc.*, *supra*, at 14. For accounting purposes I assume that such amount will be capitalized and the Court makes a like assumption that when the pier was constructed in 1930 cost of both steel and labor was similarly capitalized. I do not include as an additional basis for depreciation the cost of replacement of asphalt, deadman piles and the like.

The replaced portion of the pier represented about 16% of the pier and bulkhead. Defendants maintain that it was around 22%. The shipowner contends that American Oil Company has been restored to a "vastly superior" status to that of the condition of the damaged section prior to the collision. However, I do not find that in terms of betterment the new construction achieved a great deal more than returning the pier as a whole to its condition before the collision. The life span of the newly-replaced portion is problematical. It depends on future contingencies. There is the possibility of a *complete* rebuilding of the pier prior to the anticipated life of the old structure. The existence of a "jog" as the result of replacement of the damaged section may present difficulties to the owner when the old portion of the pier is rebuilt. *Cf. T. H. Browning Steamship Company v. F. H. Peavey & Company*, 235 F.2d 5, 9 (8th Cir.). The testimony of the experts is in conflict as to tying in the new section with the replacement of the original pier. I do not see where libellant is reaping any real profit from the collision at the unjust expense of the defendants.

(41) I find that a 25% allowance for depreciation of the cost of furnishing and driving new steel piling is fair under the evidence. What the Court has tried to do is to make the innocent pier owner whole, no more and no less. As fact-finder, I am not bound to accept or mechanically apply the percentage of depreciation estimated by the experts. See *Jones v. N.V. Nederlandsch-Amerikaansche Stoomvaart M.*, 374 F.2d 189, 190 (3rd Cir.); *Mims v. United States*, 375 F.2d 135 at 140 (5th Cir.).

## (H) DAMAGE TO TUG CALHOUN

(42) In its cross-claim against the *Lacon*, Atlantic Towing Company claims damages growing out of the grounding of the tug *Calhoun* during the docking operation. Subsequently, the tug required drydocking because of vibrations that developed in the propeller. The expenses claimed and paid by Atlantic for drydocking and repairs totalled $5,483 (less $50 as agreed at the trial). The total expense to the towing company is itemized as follows:

| | |
|---|---|
| Drydocking | $1,500.00 |
| Repair of tail shaft and rudder | 2,525.00 |
| Propeller repairs | 1,100.00 |
| Wedge | 43.00 |
| Gas free chemist | 225.00 |
| Shaft alignment | 90.00 |

In addition thereto, damages are sought by Atlantic for cost of surveys by American Bureau of Shipping ($135.) and Charles T. Theus, Inc. ($75.00) and also the loss of 105 feet of dacron line as a result of the parting thereof in amount of $418.95. The total of Atlantic's claim against the shipowner is $6,061.95.

I find that that amount was reasonably incurred by the towing company as the proximate result of the grounding of the *Calhoun* which was without fault on the part of that tug or the *Groves*.

## II—CONCLUSIONS OF LAW

(1) This Court has jurisdiction of the subject matter of this suit and of the parties thereto.

(2) The action is within the admiralty and maritime jurisdiction.

(3) Findings of Fact Nos. 16, 21 and 22 state and apply the established rule that a presumption of fault arises when a moving vessel collides with a standing object. I have found that the evidence of the shipowner and of the towing company failed to overcome such inference and the same conclusion is reached as a matter of law.

(4) *The Pilotage Clause is Binding on the Shipowner*

The issue of invalidity of the clause was raised before trial by motion to strike reference thereto from Atlantic's response to shipowner's cross-claim. Denying the motion, this Court said (see *American Oil Company v. M/T Lacon, supra,* 337 F.Supp. 1123, 1124):

"Counsel for the shipowner contends that the exculpatory clause is invalid because it contravenes public policy, citing the towage case of *Bisso v. Inland Waterways,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911. I dealt with the validity of this identical Pilotage Clause in *Federal Steam Navigation Company, Ltd. v. Tugs Savannah et al.,* D.C. [Ga.], 305 F.Supp. 1293. It was there held (I followed *Sun Oil Co. v. Dalzell Towing Co.,* 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311) that the clause immunized the towboat company from liability to the shipowner for damages to the vessel while she was being undocked under direction of Atlantic's docking master who was stationed on her bridge giving orders. Until told that the case in question was wrongly decided, I will abide by the holding in *Federal Steam Navigation Company, Ltd.*"

The towing company put up a good deal of evidence as to its "Schedule of Rates, Terms and Conditions for Tugs". A copy thereof was handed the Master of the *Lacon* prior to the collision. The pilotage clause appears in it in red type. The Master signed the "blue ticket" acknowledging performance of tug services "as per" the schedule.[5] (Atlantic's Exhibits #16 and #17). On six other occasions during the period of June–December, 1970, the same Master signed "blue tickets".

(5) *The Pilotage Clause Amounts to an Agreement by the Shipowner to Indemnify Atlantic from any Loss Due to a Claim of a Third Party as the Result of Negligence by the Docking Master*

Under the pilotage clause, it is provided:

"[W]henever . . . any . . . officer of any tug . . . engaged in the service of assisting a vessel . . . directs the navigation of such vessel, or . . . the assisting tugs . . . it is understood and agreed that he becomes the borrowed servant of the vessel assisted and her owner or operator for all purposes . . . subject to the exclusive supervision and control of the vessel's personnel. Any such service performed . . . is beyond the scope of his employment with Atlantic Towing Company and neither those furnishing the tugs or lending any such person . . . shall be liable for any act or omission of any such person."

Earlier, there was mention of the interlocutory order in this case reported in *American Oil Company v. M/T Lacon et al., supra.* In responding to the shipowner's cross-claim against it, Atlantic set up the pilotage clause as one of its defenses. There was a motion by the shipowner to strike which I overruled. I then proceeded to offer some observations concerning the clause. They were actually *dicta,* announced without benefit of briefs or adequate research on my

---

5. It is noted that the Master executed an acknowledgment of services of the *Calhoun* and *Groves* on the day after the collision.

part. Contracts relieving a person from liability and to indemnify another are subject to strict construction. *Atlantic Mut. Ins. Co. et al. v. Bulkcrude et al.*, 107 F.Supp. 771, 774 (D.C.Tex.) See also *United States, as Owner of the Christopher Gale v. Nielson et al.*, 349 U.S. 129, 75 S.Ct. 654, 99 L.Ed. 939. So reading the clause, I stated that it does not amount to an undertaking by the shipowner to hold Atlantic harmless from claims against it by third parties.

In the light of the cases cited below, this Court was in error as to the right to indemnity and that portion of such order is withdrawn.

In *Pennsylvania Railroad Company v. The Beatrice*, 275 F.2d 209 the Court of Appeals for the Second Circuit had before it the same clause involved here. It asked, "Was the court below right in ruling that under the pilotage clause Dalzell was entitled to be indemnified by the Beatrice interests?" The answer was that "the effect of the pilotage clause was such as to provide Dalzell [towing company] with a right to indemnification from Bull [shipowner] for liability resulting from Mattisen's negligence [docking pilot's] in the navigation of the Beatrice . . . ." At 213–214. See also the district court's decision, 161 F.Supp. 136. The *Beatrice* was followed by the Second Circuit in *Marina Mercante Nicaraguense, S.A., as owner of the Motor Vessel El Salvador*, 364 F.2d 118, 124–125 (2 Cir.).

*Moran Towing & Transportation Co. v. Navigazione Libera Triestina, S.A.*, 92 F.2d 37, 39 (2nd Cir.), cert. den., 302 U.S. 744, 58 S.Ct. 145, 82 L.Ed. 575 quotes with approval a statement of the Court of Appeals of New York that a pilotage clause is "analogous to an indemnity agreement or to an agreement securing exemption from liability for loss or damage caused by a party's own negligence." The Second Circuit ruled that by agreeing with the towing company that the tugmaster was its servant the shipowner "in effect undertook . . . to indemnify Moran for any damage sus-

tained by the tugmaster's negligence." At 38–39. In *Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F.Supp. 705, 712 it was said:

"His negligence was in his capacity as docking pilot and, therefore, the towing company is not responsible for it. There was no negligence of the towing company or the other employees thereof which contributed to the collision and this company is, therefore, entitled to a judgment in its favor on the cross-libel for indemnity for any amount for which it is held responsible in the principal action."

Thus, as remarked in *The Beatrice*, 161 F.Supp. at 149, "There is ample authority for characterizing the so-called 'pilotage clause' as an indemnity agreement between shipowner and towing company with respect to damages resulting from negligence of the latter's master while he is performing duties which fall within the scope of the clause."

(6) *Timeliness of Atlantic's Assertion of Right to Indemnity from Shipowner*

The cross-claim of the towing company against the shipowner as originally filed sought relief only in the way of damage the tug *Calhoun* sustained when she went aground during the docking operation. On November 1, 1972, two months after the trial and after briefs and proposed findings had been submitted by the parties, Atlantic amended its cross-claim to seek indemnity from the shipowner for any sum that might be awarded to plaintiff as against it. Counsel for the *Lacon* vigorously object to the indemnity claim being raised at this late hour. They argue that it amounts to a separate and distinct counterclaim and that such untimely amendments have been disallowed. See *Rogers v. Valentine*, 306 F.Supp. 34 (D.C.N.Y.), aff'd 426 F.2d 1361 (2nd Cir.) and *Lomartira v. American Automobile Insurance Company*, 371 F.2d 550 (2nd Cir.).

In the exercise of the Court's discretion as to allowance of such an amendment an important factor to be

considered is whether it will result in undue prejudice to the other party. 3 Moore's Federal Practice § 15.08[4], p. 897. The shipowner asserts, without stating reasons that prejudice to it precludes the grant of the amendment after trial. How was the shipowner prejudiced by Atlantic's delay in asserting the right to be indemnified? What possible evidence could have been offered to controvert right to indemnification under the pilotage clause? Either during the trial or now?

All counsel can be talking about in respect to lack of opportunity to resist the claim is whether the pilotage clause amounts in law to a contract to be indemnified from loss to a third party in case of fault of the docking master. That is a question of law which admiralty courts have answered affirmatively.

Assertion of the right to indemnification came as no surprise to the shipowner. Its post-trial brief states that, despite this Court's restrictive reading of the clause in its interlocutory order, they "anticipated that counsel for Atlantic Towing Company will assert that the towing company is entitled to indemnity from the vessel on the basis of the clause."

 While the right to indemnity should be asserted at the outset, it does not maturate until judgment against the indemnitee. Until the instant order becomes effective, such right is merely inchoate. This is indicated by *Pennsylvania Railroad Company v. The SS Beatrice* (S.D.N.Y.), 161 F. Supp. 136, 139. There, after the trial judge had decided that libellant's barge was sunk through the negligence of two vessels, the owner of one of them impleaded the towing company alleging that it and its tug were at fault. In turn, the tug owner counter-claimed against the

*Beatrice* under the "Pilotage Indemnity Agreement"[6] and sought indemnity for any damages it might have to pay libellant. No issue was raised as to the timeliness of this claim to indemnity. The trial court sustained the right of the towboat company thereto. See 161 F. Supp. at 150.

The shipowner's objection to the allowance of Atlantic's posttrial amendment is overruled.

### (7) *Proportionate Fault of Lacon and Atlantic Towing Company*

I have found the *Lacon* to be 75% negligent and Atlantic Towing Company 25%. Where an innocent third party is damaged by mutual fault of vessels in collision, the rule in admiralty is that each shall pay one-half the entire damage. Decrees in such cases usually provide that if libellant cannot collect the portion due by one of the vessels, the other must make up the deficiency. 3 Benedict on Admiralty § 416 (6th ed.); *Smith v. Nicholson Transit Co.*, 39 F. Supp. 795, 797 (D.C.N.Y.); *Crain Brothers, Inc. v. Wieman and Ward Company*, 223 F.2d 256, 259 (3rd Cir.); *Empire Seafoods, Inc. v. Anderson et al.*, 398 F.2d 204, 217 (5th Cir.); *Pennsylvania Railroad Company v. The Beatrice*, 275 F.2d 209, 212 (2nd Cir.).

Here, there was only one vessel at fault. Neither of the two tugs contributed, as this Court has found, to the collision and the liability of Atlantic to American Oil Company is predicated on the management of the *Lacon* by the docking master. The decisions hold that the divided-damage rule in admiralty is applicable in such cases. See *Pennsylvania Railroad Company v. The SS Beatrice*, 161 F.Supp. 136, 139; aff'd. 275 F.2d 209; *Marina Mercante Nicaraguense, supra*, 364 F.2d at 124–125; *State of Oregon v. The Tug Go-Getter*,

---

6. It provided, as here, that its docking pilot who goes aboard a vessel becomes a servant of the owner in respect to giving orders to tugs and in the handling of the assisted vessel.

299 F.Supp. 269, 277 (D.C.Or.). Should the rule of equal division of damages be applicable here, this would appear to be a proper case for a higher court either to draw a distinction or to limit that much criticized doctrine.[7]

However, the judicial construction of pilotage clauses makes it unnecessary to apply the divided-damage rule here. In view of the clause the matter becomes academic. Damages awarded to an innocent third party are divided equally in theory only where parties have contracted that only one shall bear the loss. Atlantic's liability to American derives through the docking master who by a fiction was made the employee ("borrowed servant") of the owner of the *Lacon*. Either in whole or by halves or in proportion to fault, the defendants are jointly and severally liable to American Oil Company.[8] As matters stand, the shipowner will end up bearing the entire damage since it must indemnify the towboat company for anything the latter pays out.

(8) American Oil Company is entitled to judgment against the defendants in the sum of $79,509.09, made up of the following items of damage and expense:

| | |
|---|---:|
| Survey of damage and recommendation of repairs (United States Salvage Association) ....$ | 843.09 |
| Emergency repairs ...... | 6,439.70 |

| | |
|---|---:|
| Contract repairs .........$60,982.80 [9] | |
| Barge rental ........... | 8,293.50 |
| Repaving .............. | 2,450.00 |
| Rubber fender ......... | 500.00 |
| **TOTAL** | **$79,509.09** |

---

(9) Atlantic Towing Company is entitled to judgment on its cross-claim against the shipowner and the *Lacon* on its cross-claim of one-half of the total damage to the tug or $3,030.97. The decision of the Second Circuit in *Petition of Marina Mercante Nicaraguense, supra*, 364 F.2d 118 is quite in point. In that case the New York pilotage clause was involved. There was a negligent docking pilot furnished by the towboat company who along with personnel of the assisted vessel was at fault. As a result of such negligence, the assisting tug was lost. The Court of Appeals said:

"Just as the clause may not be invoked by the tug owner to impose liability on the ship for injury to the tug, see *States Marine Corp. of Del. v. Victory Carriers, Inc.*, 272 F.2d 463, 469 (9 Cir., 1959), so also it should not be available to cut off an assertion of contributory negligence when the pilot's employer seeks damages for its tug in a case where there

---

7. Under the Brussels Convention of 1910 damages growing out of ship collisions are proportioned according to degree of fault. The United States is not a signatory party. Our admiralty courts since 1855 have followed *The Schooner Catherine v. Dickinson*, 17 How. 170, 58 U.S. 170, 15 L.Ed. 233, which established the rule of equal division of damages to vessels in collision. In *Union Oil Company of California v. San Jacinto*, 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365, the Supreme Court had granted certiorari principally to consider a request as to abandonment of the divided damage rule. For a case note on *Union Oil Company* and discussion of the rule see *Jour-nal of Maritime Law and Commerce* (April, 1973), pp. 478–480.

8. If responsibility for the damage as between the two defendants is apportioned 75% and 25%, respectively, the same result would obtain. As it turns out, this finding as to proportionate fault is not necessary. It was made with an eye to possible relevance on appeal.

9. This is a net figure after deduction of 25% depreciation based on cost and installation of steel pilings used in the replaced section.

was causal fault both by the pilot and by the ship's personnel."

The Court concluded that it was appropriate to apply the admiralty rule of divided damages. The towboat company was awarded one-half the damage to its tug. 364 F.2d at 125. I have followed the ruling of the Second Circuit.

(10) *Interest*

 The award of pre-judgment interest in admiralty is within the sound discretion of the trial court. *Chagois v. Lykes Bros. Steamship Co.*, 432 F.2d 388 (5th Cir.). In some Circuits interest on recovery for repairs runs only from date of payment. *The Hygrade No. 24 v. The Dynamic*, 233 F.2d 444 (2nd Cir.); *Utility Service Corporation v. Hillman Transportation Company*, 244 F.2d 121 (3rd Cir.). The shipowner relies on the line of authority illustrated by the last two cases. The trouble is that it is out of accord with the holding of the Fifth Circuit that "interest on damages should be allowed uniformly from the date of the loss, unless for good reasons it is determined otherwise." *Esso Internationol Inc. v. The SS Captain John*, 443 F.2d 1144, 1151. See also *Mobil Oil Corporation et al. v. Tug Pensacola*, 472 F.2d 1175 (5th Cir.). I find no special or peculiar circumstances justifying an exception to this Circuit's governing rule.

(11) *Form of Judgment*

Counsel will submit a form of judgment in favor of American Oil Company against the *Lacon* and her owner (which represent one interest) and Atlantic Towing Company in the amount of the total loss sustained by the pier owner. Each such interest will be equally liable for the judgment with the provision that if one fails to pay its one-half portion of the award, the other shall discharge it. The judgment against Atlantic shall not prejudice its right to indemnity from the *Lacon* and her owner.

The decree or judgment on the towing company's cross-claim should declare Atlantic's right to indemnity from the shipowner in respect to its liability on American's claim against the defendants.