541 F.Supp. 297 (1982)
EAGLE MARINE INDUSTRIES, INC., a corporation, Plaintiff,
v.
The VALLEY LINE COMPANY, Security Barge Lines, Inc., Missouri River Barge Lines, Inc., the Pillsbury Company and Monsanto Company, Intervenor-Plaintiffs,
v.
ARCHWAY FLEETING & HARBOR SERVICE, INC., Defendant and Third-Party Plaintiff,
v.
CONSOLIDATED GRAIN AND BARGE COMPANY, Third-Party Defendant.
No. 80-1119A (B).
United States District Court, E. D. Missouri, E. D.
May 27, 1982.
*298 Peter Hoffman, Michael O'Keefe, John Sandberg, St. Louis, Mo., for plaintiff.
Joseph Murhpy, James Herron, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
NANGLE, District Judge.
This case arises out of a breakaway on the afternoon of April 9, 1980. The principal issue is the respective liability of defendant Archway Fleeting & Harbor Service, Inc. (Archway) and third party defendant Consolidated Grain and Barge Company (Consolidated) for the resultant damages. The remaining issue pertains to the amount of damages to which intervenor-plaintiff Monsanto Company (Monsanto) is entitled.
Archway maintained a fleet at the foot of Chouteau Avenue on the Missouri shore of the Upper Mississippi River just south of the MacArthur Bridge. On the afternoon in question two of Archway's harbor boats (M/V John F. Walker and M/V Katie) were rearranging the fleet in which ten loaded hopper barges owned pro hac vice by Consolidated were moored so that a northbound tow could be made up. As part of this rearrangement the ten loaded Consolidated barges were temporarily moved from the Chouteau fleet site to a point near the Illinois shore. Eight of the loaded barges were taken across the river by the M/V John F. Walker and the other two were brought to the Illinois bank by M/V Katie. The M/V John F. Walker is a 26 feet wide, twin-screw, diesel powered harbor boat, with 1350 horsepower rating. The M/V Katie is a twin-screw, diesel powered harbor boat with 1200 horsepower. Both are equipped with two steering and two flanking rudders.
*299 The barges were assembled into a single tow for movement back to the fleet. The tow was made up in three strings, with the starboard and center strings being four long and the port string having two barges. The tow was three barges wide at its head and second tier. The M/V Walker was faced up to the bow of the Jackie-21, one of the Consolidated barges, which was the sternmost barge of the starboard string. Face wires from the M/V John F. Walker were firmly attached to deck fittings at the port and starboard corners of the bow of the Jackie-21. The M/V Katie was positioned against the box end of the sternmost barge of the center string of the barges for the movement of the barges back to the Chouteau fleet site. It was not wired to the tow because it lacked lower tow knees and so was to be used only to apply power and shove straight ahead with its rudders.
The two harbor boats began returning the ten barges to the Chouteau site by flanking the tow back across the river. The current was swift and the river rising. After the tow reached the midpoint of the river, it was caught by the current and began to top swiftly to port. The pilot of the M/V John F. Walker attempted to stop the rapid topping and bring the stern of the tow into alignment with its head by applying full starboard rudder. The port bow timberhead to which the face wire had been attached then sheared off. The tow continued to top around and ultimately it struck the Valley Fleet on the Missouri shore. As the result of the collision, the barges in the tow became adrift in the river causing substantial damage to the property of plaintiff and intervening plaintiffs.
The parties have stipulated as to the amount of damages sustained by plaintiff and by all intervening plaintiffs other than Monsanto as well as by Consolidated. By said stipulation, it was agreed that plaintiff (Eagle Marine Industries, Inc.) sustained damages in the amount of $14,741.45; that Consolidated sustained damages in the amount of $22,691.22; that intervenor-plaintiffs The Valley Line Company and its subsidiaries Security Barge Line, Inc. and Missouri River Barge Lines, Inc. were damaged in the amount of $101,607.98, and that the Pillsbury Company sustained damages in the amount of $29,123. As to each of said parties other than Consolidated, it was stipulated that judgment be entered in favor of said party in the amount stipulated together with pre-judgment interest at the rate of ten per cent per annum from October 19, 1981.
Before addressing the issue of liability, we determine the amount of damages sustained by Monsanto when one of the barges which had broken loose from the tow struck its dock facilities located on wharf premises which Monsanto had theretofore leased from the City of St. Louis. The dock had been constructed by Clark Oil and Refining Company, then the lessee of the wharf premises, about 30 years ago. In May, 1968, Monsanto purchased from Clark a two acre tract of land (with a tank farm and other improvements thereon) adjoining the city wharf, together with certain described personal property. The purchase was contingent on Monsanto's obtaining (which it did) a lease of the adjoining city wharf for at least a five year period. Although neither the deed nor bill of sale contained any reference to the dock facilities, they are specifically set forth in Exhibit A to the Sale Contract as part of the property sold to Monsanto. It is clear to us, and we so find, that the dock facilities were in fact included in the purchase and that upon payment of the agreed purchase price Monsanto acquired all of Clark's interest therein.
The dock so acquired consisted of two clusters of piles for mooring barges and the dock itself, a four level unloading platform connected by a walkway to the shore. A pipeline extended from the shore to the dock. At the dock end of the pipeline was 90 feet of 6 inch petroleum hose which was moved by a crane on the end of the dock. The dock was vulnerable to damage by barge traffic necessitating relatively frequent repairs and replacements. As Monsanto's witness Hines put it, without major replacements this dock just couldn't take the "abuse" to which it was constantly subjected. Thus, in July, 1978, the south pile *300 cluster had been destroyed. Shortly after being replaced at a cost of $15,117 it was again destroyed as the result of another collision, but has not been replaced. The north pile cluster had also been the victim of an accident which left the cluster in a leaning condition (and was not in operation) on April 9, 1980 nor for more than a year prior thereto.
We apply the rule stated in American Oil Co. v. M/T Lacon, 398 F.Supp. 1181, (D.C.Ga.1973): "What the dock owner is entitled to is to be made whole for the damages to the pier as it existed at the time of the collision. That is, "(a) party suffering injury to his property is entitled to no more than restoration to the condition prior to the wrong." Petition of M/V Elaine Jones, 480 F.2d 11, 27 (5 Cir. 1973). Or, as stated in Freeport Sulphur Co. v. S/S Hermosa, 526 F.2d 300, 304 (5 Cir. 1976): "The purpose of compensatory damages is to place the injured person as nearly as possibly in the condition he would have occupied if the wrong had not occurred."
We note in passing the argument of Monsanto that under admiralty law an award of damages "is based on the concept of compensation for loss of the ability to use the facility." However, were we to apply this principle literally there would be no basis for any award in view of the admitted fact that Monsanto's ability to use the dock was non-existent as of April 9, 1980 and for a period of time prior thereto. Nevertheless, the fact that the dock could not be (and so was not) used or usable as of the time of the collision bears importantly in the determination of the amount which should be assessed as damages.
We have adverted to the fact that not only was the south pile cluster completely absent for over a year prior to April 9, 1980, but that the north pile cluster was then in a damaged condition. Although Monsanto now minimizes the extent of the damage to the north cluster by stating that it had "only" a 10% list, we note that less than a month prior to April 9, 1980, Monsanto obtained a bid from Vollmar Bros. Construction Co. for the construction of an entirely new replacement for this pile cluster at a cost of over $21,000 exclusive of the cost of removing the existing cluster. Thus, it may be inferred that the north cluster was then significantly below its desirable strength. And unquestionably the dock itself was in need of substantial repairs and replacements as the result of an August 1, 1978 collision, as is evidenced by a Vollmar Bros. proposal to Monsanto dated March 6, 1979 to do the following work for $11,271:
"1) Re-align upstream floor beam on top level so that it sits squarely on the two supporting pile. Drive drift pins to hold beam to pile.
2) Remove two 90° elbow pipes and install one straight spool piece approximately two feet long.
3) Replace portion of second level dock (2nd deck below top deck) and supporting beams.
4) Repair upstream riverward supporting pile, which is broken at a point between the first and second level below top level, by using a split pipe about 8 feet long bolted around the pile at the break.
5) Re-align wooden stairway and its handrail which extends from the first level to the second level.
6) Replace completely wooden stairway and handrail which extends from the second level to the third (bottom) level."
This work was never done, possibly because the dock would nevertheless remain inoperable absent two sound pile clusters. Complicating the problem of making Monsanto whole for the damage caused by the April 9, 1980 collision is the fact that Monsanto's second five year lease with mooring rights had expired on April 8, 1979, following which it became, under the terms of the lease, a month-to-month tenant for only a one year period expiring April 8, 1980, one day before the casualty.
It is true that Monsanto has remained in possession of the leased property while its application for a new and longer term lease *301 was pending before the Board of Aldermen of St. Louis, the only agent of the City authorized to grant applications for leases of river front rights. Clearly, as of April 9, 1980 and for a substantial period thereafter, there was no certainty that the Board of Aldermen would act favorably on Monsanto's application. In fact, an internal memorandum by Frank Kaprive dated July 6, 1981 expressed concern over the possibility that the application might be rejected. In the event the Board of Aldermen would have rejected Monsanto's application, its only alternatives would have been to remove the useless dock from the City's premises or (more likely) abandon the dock or the major portion thereof. Even as late as the trial of this cause in late December, 1981 the new lease had not been finalized and the dock has remained inoperable.
In the interim, Monsanto has not decided whether to sell, lease or make any other disposition of the terminal. And the longer Monsanto delays in restoring the dock to a usable condition (assuming it will ultimately decide to do so) the greater the cost. In October, 1978, Vollmar replaced one cluster of 14 timber piles at a cost of $15,117. In March, 1980, Vollmar agreed to replace both pile clusters with 14 timber poles each, for a total of $42,416. In July, 1980 Massman Construction Company bid $66,907 to construct two 13 pile timber clusters. And in September, 1980, Vollmar's bid was for $70,902 to replace the pile clusters with 19 timber poles each.
Monsanto is in agreement that it should not be compensated in an amount in excess of that required to place the dock in the "condition it would have been had the casualty not occurred." Yet not only are the damages it seeks to recover greatly in excess of such amount, but such restoration to its pre-April 9, 1980 condition would leave Monsanto with a damaged and completely inoperable dock and so would serve no useful purpose whatever. The estimates of Monsanto's witnesses that as of April 8, 1980, the dock had a useful life of ten to fifteen years are entirely unrealistic and assume, contrary to the fact, that the dock was then in an operable condition. We find that in the condition of the dock immediately prior to the casualty it had very little useful life remaining, and that Monsanto's only viable alternative at that time, should it ultimately obtain a lease and decide to operate the dock was to completely rebuild and strengthen the facility.
Allowing the sum of approximately $6,000 for the damage to the hose and crane on the dock and taking into account all of the factors heretofore adverted to, we find that a reasonable sum to be awarded Monsanto for damages to the dock facility should not exceed the sum of $30,000.
We next consider the issue of liability. First, as to Consolidated. The evidence establishes that the port bow timberhead of the Jackie-21 was defective. The defect was a latent one which was not apparent at the time this barge (and the other Consolidated barges) was delivered to Archway for fleeting. By reason of this defect the Jackie-21 was unseaworthy, so that Consolidated breached its continuing and nondelegable duty to deliver to Archway a seaworthy barge. The very purpose of the timberhead was to enable the fleeter to tie to it the face wires of the harbor boat. Archway was entitled to assume that the timberhead would withstand reasonable stresses when as in this case there was no slack in the face wires. However, the pressure placed upon it when the pilot of the M/V John F. Walker applied full starboard rudder cause the timberhead to fracture, thus dooming the tow. The resultant stress was reasonably to be anticipated, and but for the defect, the timberhead would have been able to withstand the pressure.
Archway argues that the unseaworthiness of Jackie 21 was the sole proximate cause of the damage, and that it should be absolved of all liability. Contrariwise, Consolidated takes the position that as of the time the timberhead broke, the tow was already on an inevitable collision course. We are unable to so find. Under the existent circumstances, we believe that Archway failed to use reasonable care and skill that prudent navigators would employ *302 for similar services and was thereby negligent, in that a prudent navigator would not have placed the M/V John F. Walker at the stern of the starboard string of barges. So, too, the placement of the M/V Katie (which we hold was unseaworthy in that it lacked lower tow knees) at the stern of the center string of barges improperly and adversely affected its ability to add the necessary horsepower with which to push the tow. Hence, when the timberhead fractured (but not prior thereto) the collision and breakaway were inevitable.
We find that the defective timberhead rendering the Jackie 21 unseaworthy was, at the very least, a contributing cause of that casualty. We further find that Archway's negligence was also a contributing cause. In our judgment, Archway and Consolidated were equally at fault. It follows that Archway and Consolidated are both liable to the plaintiff and intervening plaintiffs for the damages caused to them by the breakaway. It also follows that Archway is liable to Consolidated for one-half of its stipulated damages.
The foregoing Memorandum Opinion constitutes our findings of fact and conclusions of law. Judgment will be entered in accordance herewith.